RENDERED: AUGUST 23, 2012
TO BE PUBLISHED

$\mathfrak{Supreme}$ $\mathfrak{Court}$ $\mathfrak{of}$ $\mathfrak{Kentucky}$ FINAL

2008-SC-000789-DG
2009-SC-000390-DG

DATE 9-13-12 ꞓɪɪAGrouﬅᴰ.C.

MICHAEL SCHNUERLE, AMY GILBERT,  APPELLANTS/CROSS-APPELLEES
LANCE GILBERT AND ROBIN WOLFF

ON REVIEW FROM COURT OF APPEALS
V.                          CASE NO. 2006-CA-002121-MR
JEFFERSON CIRCUIT COURT NO. 06-CI-004267

INSIGHT COMMUNICATIONS, COMPANY,  APPELLEES/CROSS-APPELLANTS
L.P. AND  INSIGHT COMMUNICATIONS
MIDWEST, LLC

**OPINION OF THE COURT BY JUSTICE VENTERS**

**AFFIRMING IN PART, REVERSING IN PART AND REMANDING**

Appellants Michael Schnuerle, Amy Gilbert, Lance Gilbert, and Robin

Wolff, individually and on behalf of all others similarly situated, filed a class

action complaint in the Jefferson Circuit Court against their Internet service

providers, Appellees Insight Communications Company, L.P., and Insight

Communications Midwest, LLC (collectively, Insight). Insight's Broadband High

Speed Internet Service Agreement (Service Agreement) contained an arbitration

clause that required customers to submit damage claims against Insight to

arbitration, and it also barred class action litigation against Insight by its

customers. The circuit court determined that the class action ban was

enforceable, and therefore it dismissed Appellants' complaint. The Court of Appeals affirmed. Because of that disposition, neither the circuit court nor the Court of Appeals addressed other issues, including Appellants' challenge to the enforceability of the Service Agreement's general arbitration clause. We granted discretionary review to consider the challenges to the enforceability of the arbitration agreement, as well as the class action waiver and confidentiality clauses contained therein. We granted Appellees' cross-petition for discretionary review to enable a more complete resolution of the whole controversy, including the disputed choice of law provisions of the agreement and the effect of severability of the challenged provisions from the remaining portion of the arbitration agreement.

For the reasons stated below, we conclude that in cases governed by the Federal Arbitration Act, the decision of the United States Supreme Court in *AT&T Mobility LLC v. Concepcion*, ____ U.S.____, 131 S.Ct. 1740 (2011) precludes enforcement of a state policy invalidating upon grounds of unconscionability, a contractual waiver of class action participation, where the unconscionability is based solely upon the fact that the dispute involves a large number of *de minimis* claims which are unlikely to be individually litigated. Consequently, in the dispute before this Court, the contractual provision under which Appellants waived their right to participate in class action litigation is now enforceable under federal law. We also determine as follows: 1) that the Service Agreement's choice of law provision is not enforceable, and that Kentucky law, rather than New York law, is applicable to our review;

2

2) that the Service Agreement's general arbitration provision is not unconscionable, that it comports with Kentucky's public policy preference favoring arbitration, and is therefore enforceable; and 3) that the provision imposing a confidentiality requirement upon the litigants to arbitration proceedings is void and is severable from the remaining portions of the agreement. As such, we affirm in part, reverse in part and remand to the Jefferson Circuit Court for entry of a final judgment consistent with this opinion.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Appellants are all Kentucky residents who entered into the Service Agreement with Insight for broadband Internet service in the area of Jefferson County, Kentucky. In order to receive service, the customers were required to either sign the Service Agreement or manifest their assent to the Service Agreement via the Internet.

The Service Agreement contains an arbitration clause. Within the arbitration clause are provisions under which customers agree not to enter into a class action lawsuit against Insight and not to divulge the results of any settlement reached through arbitration. The clause, however, does permit individual customers to pursue any claim of less than $1,500.00 through small claims court instead of proceeding to arbitration.

Insight's 2006 effort to upgrade its high-speed Internet service left many of its customers, including Appellants, with service outages for varying lengths

3

of time. Those outages generated a high volume of calls into Insight's customer service department, which resulted in long wait times for customers to receive assistance. According to Appellants, once customers did get through, they received false and misleading information concerning the service interruption. They further allege that Insight acted improperly by failing to timely inform its customers about the outage, and by failing to protect customers "from deletion of information."

Insight responds that it acknowledged the problem in a timely fashion and issued credits to 2,595 customers who notified the company of their particular outage problem. The company later issued a public apology for the disruptions and set up a voucher system allowing any other dissatisfied customers to request a credit for the interrupted service. Insight admits to monetary liability for any service it billed to customers while their Internet connection was down, and maintains that any dispute would simply require calculating the actual outage time, which it is willing to do under its customer service procedures.

Notwithstanding Insight's efforts to address the problem, Appellants filed a complaint in Jefferson Circuit Court on behalf of themselves individually, and, pursuant to CR 23, on behalf of the putative class of all other Insight customers in Kentucky similarly situated. Causes of action were asserted based upon violations of the Kentucky Consumer Protection Act, KRS 367.170, *et seq.*, breach of contract, and unjust enrichment.

4

Insight moved to dismiss the action and to compel arbitration pursuant to the mandatory arbitration clause contained in the Service Agreement. As noted above, the arbitration clause does not mandate arbitration of every dispute but, rather, it allows claims less than $1,500.00 to be litigated. There is no allegation that the claim of any individual customer would exceed $1,500.00. The typical claim would be in the range of $40.00. Thus, it is apparent that any member of the putative class would have the options of filing a suit in small claims court or proceeding to arbitration.

Appellants argued that the arbitration clause was unenforceable on the grounds that it was an unconscionable provision of an adhesion contract imposed upon them by a party with significantly greater bargaining power. Appellants also argued that the arbitration clause was communicated to customers in a manner that ensured few, if any, would read it; that they were forced to use Insight's services because it was the only local broadband cable Internet provider; that they could not effectively pursue their claims on an individual basis; and that, because of the small amounts involved, individual customers would be unable to retain counsel willing to take the case.

The trial court granted Insight's motion to compel arbitration and it dismissed the class action with prejudice, requiring claimants to pursue their remedy individually through arbitration or in small claims court as provided in the Service Agreement. The Court of Appeals affirmed the circuit court's decision. We granted discretionary review.

On December 16, 2010, this Court rendered an opinion in this case. While Appellee's petition for rehearing or modification of our opinion was pending, the United States Supreme Court rendered its opinion in *AT&T Mobility LLC v. Concepcion, supra,* a decision that dealt with a substantially similar issue: the enforceability of a class action waiver in a contract that also required arbitration of any disputes arising out of the contract. We ordered supplemental briefing and heard oral arguments on the applicability of *Concepcion.* Having now reconsidered our previous opinion in light of the United States Supreme Court's decision in *Concepcion,* we have withdrawn our earlier rendition and substituted this opinion.

## II. OUR REVIEW IN THIS CASE IS GOVERNED BY PRINCIPLES OF KENTUCKY LAW RATHER THAN NEW YORK LAW

Among the provisions contained in the Dispute Resolution section of the Service Agreement is a choice of law clause which provides that "New York Law, (excluding its choice of law rules) will apply to the construction, interpretation, and enforcement of" the Service Agreement. Citing to *Breeding v. Massachusetts Indem. and Life Ins. Co.,* 633 S.W.2d 717 (Ky. 1982), the circuit court declined to apply the Service Agreement's choice of law provision, and instead applied Kentucky law in determining whether the arbitration agreement was enforceable.[1] Because the choice of law is a threshold question

---

[1] Despite a choice of law provision calling for application of New York law, the circuit court held that Kentucky law applied. Without discussion, the Court of Appeals decision applied Kentucky law and thus, by implication, affirmed the circuit court upon this issue.

6

in our review and was raised by Insight in its cross-petition, we first address the enforceability of the Service Agreement's choice of law provision.

*Breeding,* upon which the circuit court relied, addressed the issue as follows:

> The traditional choice of law rules in the field of contracts dictated that matters bearing upon the execution, interpretation and validity of a contract were determinable by the internal law of the place where the contract was made. *Babcock v. Jackson,* 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963).
>
> However, such a mechanical approach is no longer favored. This court in *Lewis v. Family Group,* Ky., 555 S.W.2d 579 (1977) abrogated the traditional rule of *lex loci contractus* stating:
>
> > Traditionally the rule has been that the validity of a contract is to be determined by the laws of the state in which it was made . . . . The modern test is which state has the most significant relationship to the transaction and the parties. Restatement Second of Conflicts, Sec. 188 (1971).[2] *Lewis, supra,* pp. 581-582.
>
> Increasingly, states have adopted the grouping of contacts doctrine. Justice, fairness and the best practical result may best be achieved by giving controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation. *Babcock v. Jackson,* 240 N.Y.S.2d 743, at 749, 191 N.E.2d 279, at 283, *supra.*
>
> The merit of the doctrine followed in *Babcock, supra,* is that it gives to the forum having the most interest in the problem paramount

---

[2] Section 188 provides, in relevant part: "(1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties . . . . (2) In the absence of an effective choice of law by the parties (*see* § 187), the contacts to be taken into account . . . to determine the law applicable to an issue include: (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties . . . ."

control over the legal issues arising out of a particular factual context.

*Id.* at 719; *see also Harris Corp. v. Comair, Inc.,* 712 F.2d 1069, 1071 (6th Cir. 1983) and *Wallace Hardware Co., Inc. v. Abrams,* 223 F.3d 382 (6th Cir. 2000). The *Breeding* decision held that Kentucky law should apply because Kentucky had the greater interest in, and the most significant relationship to, the transaction and the parties.

Upon application of *Breeding*, we agree with the circuit court's conclusion that Kentucky law governs our evaluation of the Service Agreement. Appellants, the other members of the putative class, the Internet equipment, the Internet service provided, and the relevant operating area are all located in Kentucky. The customers executed the agreements in Kentucky, and Kentucky has a substantial interest in the protection of its residents in the area of commercial transactions. Moreover, one of the principal claims arises under the Kentucky Consumer Protection Act. New York, on the other hand, has no discernible connection or interest at all in the subject matter of this litigation. Thus, there can be no doubt that Kentucky has "the greater interest and the most significant relationship to the transaction and the parties."

We accordingly base our review of the Service Agreement on relevant Kentucky law. We further note, however, that the parties do not dispute that the Federal Arbitration Act (FAA) is applicable to the arbitration clause, and we accordingly apply its provisions as appropriate.

8

## III. THE SERVICE AGREEMENT'S COMPREHENSIVE BAN ON CLASS ACTION LITIGATION IS ENFORCEABLE UNDER FEDERAL ARBITRATION LAW

The principal issue in this appeal is whether the Service Agreement's ban on class action litigation is enforceable against Appellants and the members of the putative class they would represent. The ban on class actions found in Insight's Service Agreement in this case is comprehensive and absolute, prohibiting the joining of disputes of different claimants, in lawsuits and in arbitration, in all situations and in all forums.[3]

Appellants contend that Insight's prohibition on class action litigation effectively immunizes it from liability for wrongful conduct resulting in many small claims, because it removes the only viable and economically effective remedy available for the redress of such claims.[4] They argue that because it is

---

[3] Provision 5(e) of the Service Agreement provides as follows:

> **No Class Action or Consolidated Proceedings.** NO DISPUTE MAY BE JOINED WITH ANOTHER LAWSUIT, OR IN AN ARBITRATION WITH A DISPUTE OF ANY OTHER PERSON. All parties to the arbitration must be individually named. THERE SHALL BE NO RIGHT OR AUTHORITY FOR ANY CLAIMS TO BE ARBITRATED ON A CLASS ACTION OR CONSOLIDATED BASIS OR ON BASES INVOLVING CLAIMS BROUGHT IN A PURPORTED REPRESENTATIVE CAPACITY ON BEHALF OF THE GENERAL PUBLIC (SUCH AS A PRIVATE ATTORNEY GENERAL), OTHER SUBSCRIBERS, OR OTHER PERSONS SIMILARLY SITUATED. Customer understands and acknowledges that by consenting to submit claims to arbitration pursuant to this Agreement, Customer may be forfeiting his or her right to share in any class action awards. This Section will not apply to any individual claims filed by Customer in a lawsuit prior to the effective date of this Agreement, nor to the claims of a class certified prior to the effective date of this Agreement. This Section will apply to all other claims, including class claims where a class has not yet been certified, even if the facts and circumstances upon which the claims are based occurred or existed before the effective date of this Agreement.

[4] The Attorney General of Kentucky, AARP, and the Kentucky Justice Association filed amicus curiae briefs supporting Appellants on this issue. The Pacific Legal Foundation filed a brief in support of upholding the class action ban provision.

not economically practical for an individual customer to independently litigate his or her *de minimis* claim, the class action prohibition effectively exculpates Insight from liability for such claims and, correspondingly, it thereby unjustly enriches the company because it will never have to provide recompense for the many small claims.[5]

We agree that the purpose of the class action under CR 23 is to provide a remedy for the very concerns that Appellants raise. The practical effect of *de minimis* claims situations has been explained in other cases addressing class action litigation. "Economic reality dictates that [litigation involving many small claims] proceed as a class action or not at all." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 161 (1974) ("A critical fact in this litigation is that petitioner's individual stake in the damages award he seeks is only $70. No competent attorney would undertake this complex antitrust action to recover so inconsequential an amount."). "The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 617 (1997)

---

[5] Insight notes that customers in cases of this type could pursue a remedy through the Attorney General, who is vested with authority under the Kentucky Consumer Protection Act to pursue litigation against companies who would improperly overcharge its customers. However, as noted by the Attorney General, "with the limited resources of the Commonwealth the Attorney General is simply unable to pursue each and every violator and must limit its case selection to those matters involving the greatest public interest." Brief of the Attorney General of Kentucky, pg. 4.

10

(quoting *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1997));

*Carnegie v. Household Intern., Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) (Posner,

J.) ("The *realistic* alternative to a class action is not 17 million individual suits,

but zero individual suits, as only a lunatic or a fanatic sues for $30.").[6] [7]

Because of the important purpose served by class actions, we would be

inclined to join the jurisdictions, such as those just mentioned, that have

invalidated provisions of consumer adhesion contracts that bar class action

resolution of disputes. Our initial opinion in this case so held. However, upon

application of *Concepcion*, we are now constrained to conclude that under

contracts like the one now before us, which contain a class action waiver and

also require disputes to be arbitrated under the FAA, the federal policy favoring

arbitration preempts any state law or policy invalidating the class action waiver

as unconscionable based solely upon the grounds that the dispute involves

many *de minimis* claims which are, individually, unlikely to be litigated. We

are satisfied that *Concepcion* is dispositive, and therefore, we turn our

discussion to its application in this case.

---

[6] The holdings in the aforementioned cases would be substantially affected by the holding in *Concepcion*.

[7] We note also that the class action is a creation of the courts, not the legislatures, hence its foundation in this country is in the court-established civil rules, rather than the statutes. As was the case in England, class actions in the United States are an outgrowth of the compulsory joinder rule that prevailed in courts of equity. *Shaw v. Toshiba America Information Systems, Inc.*, 91 F.Supp.2d 942, 946-951 (E.D. Tex. 2000) (recounting history of class action litigation). *See also Hansberry v. Lee*, 311 U.S. 32, 41 (1940) ("The class suit was an invention of equity to enable it to proceed to a decree in suits where the number of those interested in the subject of the litigation is so great that their joinder as parties in conformity to the usual rules of procedure is impracticable.") As such, courts enjoy wider latitude in determining public policy regarding class actions and fashioning remedies in this type of litigation.

11

As a preliminary matter, Appellants argue that Insight has waived the federal preemption argument of *Concepcion*, or is judicially estopped from asserting that defense, by "t[aking] the position that state law governed the enforceability of its class action ban." Appellant's Supplemental Authority Brief, pg. 2. Clearly, the arbitration clause in this proceeding specifically provided that it was to be controlled, as applicable, by the FAA. To our knowledge, Insight has not contended otherwise. Moreover, we regard Insight's earlier references to state law analysis as indicating no more than the unexceptional and well-established rule that the interpretation of an arbitration agreement is generally a matter of state contract law. *See Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630-31 (2009)(State law is applicable to determine which contracts are binding and enforceable under the FAA "if that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally," quoting *Perry v. Thomas*, 482 U.S. 483, 493, n. 9 (1987)). Thus, we conclude that Insight's request that we review this matter under the holding in *Concepcion* is properly preserved, and we do not further address Appellants' preservation arguments.[8]

---

[8] In its initial brief as Appellee, under the heading "REGARDLESS OF ANY RULING ON THE CLASS ACTION WAIVER, THE PARTIES' AGREEMENT TO ARBITRATE IS ENFORCEABLE," Insight left the clear impression that its fallback position was that if the class action waiver provision was stricken, upon application of the agreement's severability clause, the remaining portions of the arbitration agreement should be upheld, implying that if there were to be class action proceedings, its preference would be for those proceedings to be in an arbitration forum rather than in circuit court. Now that *Concepcion* has exposed the folly of that position, Insight has quickly adopted the theme of that decision.

12

We similarly reject Appellants' argument to the effect we should not accept Justice Thomas's separate opinion in *Concepcion* as a complete concurrence, and that therefore the decision is a mere plurality not commanding five votes. While Justice Thomas did indeed express a separate interpretation of FAA § 2, he nonetheless made clear his full concurrence with the majority by saying: "When possible, it is important in interpreting statutes to give lower courts guidance from a majority of the Court." *Concepcion*, 131 S.Ct. at 1754 (Thomas, J., concurring) ("Therefore, although I adhere to my views on purposes-and-objectives pre-emption [citation omitted] I reluctantly join the Court's opinion.")

In *Concepcion*, the Supreme Court considered a California case in which the plaintiffs had entered into cellular telephone service agreements with AT&T. The agreements provided for arbitration of all disputes between the parties, and further required that claims be brought in the parties' "individual capacity, and not as a plaintiff or class member in any purported class or representative proceeding." *Id.* at 1744.

When a dispute arose, AT&T moved to compel arbitration under the terms of its contract. The plaintiffs opposed the motion, contending that the arbitration agreement was unconscionable and unlawfully exculpatory under California law because it disallowed class action procedures. Relying on the rule adopted by the California Supreme Court in *Discover Bank v. Superior Court*, 113 P.3d 1100 (2005)(abrogated by *Concepcion*), the district court denied AT&T's motion to compel, finding that the arbitration provision was

13

unconscionable because AT&T had not shown that bilateral arbitration adequately substituted for the deterrent effects of class actions; the Ninth Circuit affirmed, also finding the provision unconscionable under the *Discover Bank* rule. *Laster v. AT&T Mobility LLC*, 584 F.3d 849, 855 (2009)(reversed by *Concepcion*); *Concepcion*, 131 S.Ct. at 1745. In *Discover Bank*, the California Supreme Court considered class action waivers in arbitration agreements in the context of *de minimis* claims and held them to be unconscionable and unenforceable under California law. *Discover Bank* at 1110.

The United States Supreme Court accepted certiorari in *Concepcion* to consider whether the *Discover Bank* rule and similar holdings violate Section 2 of the Federal Arbitration Act (FAA), which makes agreements to arbitrate "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract," 9 U.S.C. § 2; whether the FAA prohibits States from conditioning the enforceability of arbitration agreements on the availability of class-wide arbitration procedures; and whether § 2 preempts *Discover Bank*-type rules classifying class action waivers in consumer contracts as unconscionable.

The rationale supporting the *Discover Bank* rule, and the principal argument relied upon by the plaintiffs in *Concepcion*, is that the striking down of an exculpatory class action waiver derives from common law unconscionability doctrine and the well-established policy against exculpation provisions, and that these are well-established grounds that "exist at law or in equity for the revocation of *any* contract" under FAA § 2. The Court, however,

14

concluded that the application of doctrines normally thought to be generally applicable to any contract, such as duress or, as relevant here, unconscionability, in the context of an arbitration clause, may in practice, disfavor arbitration in a way that violates § 2 of the FAA .

The Court noted that while ostensibly these rules would apply equally to all contracts, litigation, and litigants, in practice, the rules would have a disproportionate impact on arbitration agreements, concluding that "[r]equiring the availability of class-wide arbitration interferes with fundamental attributes of arbitration and thus creates a scheme inconsistent with the FAA." *Concepcion*, 131 S.Ct. at 1748. In explaining why this is so, the Court began by noting that the "principal purpose" of the FAA is to "ensur[e] that private arbitration agreements are enforced according to their terms." *Id.* (*citing Stolt–Nielsen S.A. v. Animal Feeds Int'l Corp.*, 130 S.Ct. 1758, 1763 (2010)).[9]

The Court also cited to *Preston v. Ferrer*, 552 U.S. 346, 358 (2008), which preempted a state-law rule requiring exhaustion of administrative remedies before arbitration, where the Court emphasized that "[a] prime objective of an agreement to arbitrate is to achieve 'streamlined proceedings and expeditious results,'" which objective would be "frustrated" by requiring a dispute to be

---

[9] In its petition for rehearing, Insight also argues that we failed to give sufficient attention to *Stolt-Nielson*. We note that *Stolt-Nielson*, however, is not directly concerned with the issues we address; rather that decision concerned arbitration proceedings between sophisticated contract negotiators of equal bargaining power. In such cases, the unconscionablility analysis is quite distinct from the consumer adhesion contract situation we address, whereby the relative bargaining power of the parties is skewed heavily in favor of the commercial entity. To the extent *Stolt-Nielson* is relevant to this proceeding, those points are merged into *Concepcion*, and thus we do not undertake a detailed discussion of this case.

15

heard by an agency first, . . . and that such a rule would "at the least, hinder speedy resolution of the controversy." Analogizing to this case, the Court concluded that "California's *Discover* Bank rule similarly interferes with arbitration," noting that if there is a class action in progress, then "companies would have less incentive to continue resolving potentially duplicative claims on an individual basis." *Concepcion*, 131 S.Ct. at 1750.

The Court further cited to its holding in *Stolt–Nielsen*, 130 S.Ct. at 1776, that agreements which are silent on the question of class procedures could not be interpreted to allow them because the "changes brought about by the shift from bilateral arbitration to class action arbitration" are "fundamental." *Concepcion*, at 1750-1751.

The Court also noted that striking down class action waivers contained in arbitration clauses is detrimental to arbitration in violation of § 2 because the switch from bilateral to class arbitration sacrifices the principal advantage of arbitration, its informality, and makes the process slower, more costly, and more likely to generate a procedural morass than a final judgment. *Id.* at 1751. The Court further emphasized the complications created by the procedural formality associated with class actions, noting, for example the rigorous due process and Federal Rule of Civil Procedure — based rules required for a class action money judgment to bind absent class members in litigation, and noted that it is "unlikely that in passing the FAA Congress meant to leave the disposition of these procedural requirements to an arbitrator." *Id.*

Finally, the Court noted that class arbitration creates a substantial deterrent to arbitration because a class action greatly increases the risks to defendants of a devastating arbitration award with a very limited opportunity for judicial review of the decision. "Arbitration," the Court noted, "is poorly suited to the higher stakes of class litigation." *Id.* As such, the Court found it unlikely that Congress would have intended to allow state courts, by adopting a *Discovery Bank*-type rule, to force parties to choose between a high-stakes arbitration without meaningful appellate review, or litigation in the courts. *Id.* at 1752. Because the *Discover Bank* rule "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in favoring arbitration, the Court held that the *Discover Bank* rule is preempted by the FAA. *Id.*

As can be readily seen, the *Discover Bank* rule encompasses facts substantially identical to the facts in this case. More specifically, like the *Discover Bank* rule, the present case also includes (1) a class action waiver; (2) found in a consumer contract of adhesion; (3) involving small amounts of damages; and (4) it is alleged that the party with the superior bargaining power is unfairly withholding a small sum of money in damages from each of a large number of its consumers.

Appellants seek to distinguish *Concepcion*, relying upon three principal grounds: (1) that the *Discover Bank* rule stricken by the Court was applied systematically in any *de minimis* claim situation, and would not prevent the adoption of a similar rule that was applied only on a case-by-case basis; (2)

17

that the arbitration agreement in issue here is far less consumer-friendly than the one reviewed in *Concepcion*; and (3) that the *Mitsubishi*[10] line of cases holding that class action waivers may be stricken when consumers are otherwise unable to vindicate their rights, is unaffected by *Concepcion*, and that the clause in this case prevents the injured customers from vindicating their rights.

We are not persuaded by Appellants' effort to distinguish *Concepcion*. First, assuming that the Appellees are correct that the *Discover Bank* rule is an inflexible rule leaving no room for discretion, we are nevertheless unconvinced that simply re-characterizing the same basic idea as an individualized determination based upon the facts of each case is sufficient to evade the *Concepcion* holding. Nor do we believe this case is distinguishable by virtue of the relatively more consumer-friendly arbitration clause contained in *Concepcion* in comparison with the clause contained in this case. A careful reading of *Concepcion* discloses that the unusually consumer-friendly terms of the AT&T agreement were not particularly relevant to the Supreme Court's holding. Rather, what the Court was actually focusing on and condemning in *Concepcion* was the chilling effect on arbitration that occurs when courts are able to invalidate class action waivers in cases involving *de minimis* claims; which is precisely what the Appellants request that we do in this proceeding. We therefore believe that the less favorable terms for consumers provided by the Insight agreements offer no basis for a departure from *Concepcion*'s

---

[10] *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614 (1985).

holding. That factor simply was not central to the Supreme Court's holding in the case.

Finally, we strongly agree with Appellants that *Concepcion* does not disturb the basic principle that an arbitration clause is not enforceable if it fails to provide plaintiffs with an adequate opportunity to vindicate their claims. *See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 (1985) ("[S]o long as the prospective litigant effectively may vindicate [his] statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function."); *Green Tree Financial Corp.-Alabama v. Randolph*, 531 U.S. 79, 81 (2000) ("the existence of large arbitration costs may well preclude a litigant . . . from effectively vindicating such rights"); *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 28 (1991); *14 Penn Plaza LLC v. Pyett*, 556 U.S. 247 (2009). Accordingly, arbitration clauses certainly may continue to be struck down as unconscionable if their terms strip claimants of a statutory right, which cannot be vindicated by arbitration, because, for example, the arbitration costs on the plaintiff are prohibitively high; or the location of the arbitration is designated as a remote location. But again, simply the impracticality of pursuing a single, small dollar claim is not regarded as an impediment to vindicating one's rights.

Finally, it would be inaccurate to conclude that the consumers in this case cannot adequately vindicate their rights as contemplated in *Mitsubishi* for the reason that the arbitration clause in this case specifically reserves for Insight customers the same avenue of recovery available to any other plaintiff

19

with a $40.00 claim, that is, the right to go to small claims court. The cost of going to small claims is a $20.00 filing fee, CR 3.03(1)(a), plus the cost of service of process, all of which would be recoverable as part of the successful small claims judgment. And while most, if not all, consumers may well choose to forgo recovery because it is just not worth the trouble, by the Supreme Court's calculus in *Concepcion*, it is preferable for the public to suffer the unjust enrichments that defendants may occasionally gain than to burden the arbitration process favored by federal law with a *Discover Bank*-type rule. We, of course, yield as we must to the United States Supreme Court's interpretation of federal law.

In summary, we conclude that *Concepcion* is dispositive of this issue. A decision to invalidate or otherwise disregard the anti-class action provision of Insight's Service Agreements on grounds of unconscionability would undermine the federal policy favoring arbitration, and would offend the preemption provisions of the Federal Arbitration Act, as interpreted in *Concepcion*. We accordingly conclude that the Court of Appeals properly affirmed the trial court's dismissal of the putative class action claim.

## IV. THE GENERAL ARBITRATION CLAUSE IS NOT UNCONSCIONABLE

In addition to their arguments relating to the class action waiver, Appellants argue that the arbitration clause is unenforceable in its totality as an unconscionable adhesion contract term. For the reasons explained below,

we conclude that the general arbitration provisions are neither procedurally or substantively unconscionable, and remain enforceable.

## A. The Arbitration Clause

Section 5 of the Service Agreement, contains the following general provisions relevant to our review of the enforceability of the arbitration clause:

**(a) Arbitration for Resolution of Disputes.** IT IS IMPORTANT THAT YOU READ THIS ENTIRE SECTION CAREFULLY. THIS SECTION PROVIDES FOR RESOLUTION OF DISPUTES THROUGH FINAL AND BINDING ARBITRATION BEFORE A NEUTRAL ARBITRATOR INSTEAD OF IN A COURT BY A JUDGE OR JURY OR THROUGH A CLASS ACTION. YOU continue to have CERTAIN RIGHTS TO OBTAIN RELIEF FROM a federal or state REGULATORY agency.

**(b) BINDING ARBITRATION.** The arbitration process established by this section is governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16. The FAA, not state law, shall govern the arbitrability of all disputes between Insight regarding this Agreement and the Service. You have the right to take any dispute that qualifies to small claims court rather than arbitration. However, all other disputes arising out of or related to this Agreement (whether based in contract, tort, statute, fraud, misrepresentation or any other legal or equitable theory) must be resolved by final and binding arbitration, unless provided otherwise in this Agreement. This includes any dispute based on any product, service or advertising having a connection with this Agreement and any dispute not finally resolved by a small claims court. The arbitration will be conducted by one arbitrator using the procedures described by this Section. If any portion of this Dispute Resolution Section is determined to be unenforceable, then the remainder shall be given full force and effect. The provisions of this section shall survive termination, amendment or expiration of this Agreement.

As discussed below, we discern nothing unconscionable, or unenforceable about this arbitration clause.

## B. Kentucky Law Favors Arbitration

We begin by noting that in Kentucky, unlike most jurisdictions, arbitration enjoys the imprimatur of our state Constitution. Section 250 of the Kentucky Constitution provides "It shall be the duty of the General Assembly to enact such laws as shall be necessary and proper to decide differences by arbitrators, the arbitrators to be appointed by the parties who may choose that summary mode of adjustment." Similar provisions were contained in Article VI, Section 10, of Kentucky's Second Constitution adopted in 1799, and in Article 8, Section 10, of Kentucky's Third Constitution adopted in 1850. *See Dutschke v. Jim Russell Realtors, Inc.*, 281 S.W.3d 817, 823 (Ky. App. 2008).

Clearly, it has long been the public policy of Kentucky that arbitration is a favored method of dispute resolution. "Arbitration has always been favored by the courts." *Poggel v. Louisville Ry. Co.*, 225 Ky. 784, 10 S.W.2d 305, 310 (1928). "Kentucky law favors the enforcement of arbitration agreements." *Medcom Contracting Services, Inc. v. Shepherdsville Christian Church Disciples of Christ*, 290 S.W.3d 681, 685 (Ky. App. 2009) (citing *Kodak Mining Co. v. Carrs Fork Corp.*, 669 S.W.2d 917 (Ky. 1984)); *see also Ally Cat, LLC v. Chauvin*, 274 S.W.3d 451, 458 (Ky. 2009).

Further, our legislature has statutorily recognized a public policy preference favoring arbitration. Subject to exceptions not relevant here, KRS 417.050 provides that "[a] written agreement to submit any existing controversy to arbitration or a provision in written contract to submit to arbitration any controversy thereafter arising between the parties is valid,

22

enforceable and irrevocable, save upon such grounds as exist at law for the revocation of any contract." Similarly, the Federal Arbitration Act, 9 U.S.C.A. § 2 (FAA), which is applicable to arbitration provisions involving interstate commerce,[11] provides that "[a] written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."

In light of our clear constitutional and statutory authorities favoring arbitration "[t]he party seeking to enforce an agreement has the burden of establishing its existence, but once prima facie evidence of the agreement has been presented, the burden shifts to the party seeking to avoid the agreement. The party seeking to avoid the arbitration agreement has a heavy burden." *Louisville Peterbilt, Inc. v. Cox*, 132 S.W.3d 850, 857 (Ky. 2004) (citation omitted). As such, we begin our review with a strong presumption that the general arbitration clause is not unconscionable.

---

[11] The parties do not dispute that the FAA is applicable to the arbitration clause under consideration. The contract for Internet service which is the subject matter of the contract clearly involves an interstate (indeed worldwide) service, and, moreover, the arbitration clause itself specifically provides that "[t]he arbitration process established by this section is governed by the [FAA]." Thus, without objection of the parties, we apply FAA provisions as appropriate.

## C. The Arbitration Clause is not Unconscionable

Appellants contend that the general arbitration clause should be held unenforceable upon the grounds that the provision is unconscionable. "A fundamental rule of contract law holds that, absent fraud in the inducement, a written agreement duly executed by the party to be held, who had an opportunity to read it, will be enforced according to its terms." *Conseco Finance Servicing Corp. v. Wilder*, 47 S.W.3d 335, 341 (Ky. App. 2001) (citing *Cline v. Allis-Chalmers Corp.*, 690 S.W.2d 764 (Ky. App. 1985)).

The doctrine of unconscionability has developed as a narrow exception to this fundamental rule. The doctrine is used by the courts to police the excesses of certain parties who abuse their right to contract freely. It is directed against one-sided, oppressive and unfairly surprising contracts, and not against the consequences *per se* of uneven bargaining power or even a simple old-fashioned bad bargain. *Id.* (citing *Louisville Bear Safety Service, Inc., v. South Central Bell Telephone Company*, 571 S.W.2d 438, 440 (Ky. App. 1978)). An unconscionable contract is "one which no man in his senses, not under delusion, would make, on the one hand, and which no fair and honest man would accept, on the other." *Id.* at 342 ((quoting Black's Law Dictionary, 1694 (4th ed. 1976)).

In *Conseco*, the Court of Appeals noted that review of arbitration clauses for unconscionability involves a two step process — first, a review focused on the procedures surrounding the making of the arbitration clause (procedural unconscionability) and second, a review of the substantive content of the

24

arbitration clause (substantive unconscionability). *Id.* at 343 n. 22. In their arguments, the parties have applied this two-step process. In light of *Conseco*, and because the parties have placed much emphasis upon this framework, we likewise review the argument using the procedural/substantive unconscionability structure.[12]

### 1. *Procedural Unconscionability*

Procedural, or "unfair surprise," unconscionability "pertains to the process by which an agreement is reached and the form of an agreement, including the use therein of fine print and convoluted or unclear language . . . . [It] involves, for example, 'material, risk-shifting' contractual terms which are not typically expected by the party who is being asked to 'assent' to them and often appear [ ] in the boilerplate of a printed form." *Conseco*, 47 S.W. 3d at 343 n. 22 (citing *Harris v. Green Tree Financial Corp.*, 183 F.3d 173, 181 (3rd Cir. 1999). Factors relevant to the procedural unconscionability inquiry include the bargaining power of the parties, "the conspicuousness and comprehensibility of the contract language, the oppressiveness of the terms, and the presence or absence of a meaningful choice." *Jenkins v. First American Cash Advance of Georgia, LLC.*, 400 F.3d 868, 875-876 (11th Cir. 2005).

---

[12] The parties raise the issue of whether a finding of unconscionability requires *both* procedural and substantive unconscionability. In our view, for the reasons reflected herein, there need not be both. Substantive unconscionability, alone, is grounds for a determination that an arbitration clause, or an individual provision thereof, is unenforceable. Similarly, the converse is true. If the arbitration clause is written in "legalese" and disguised in the "fine print," the provision may be unenforceable even though not substantively unconscionable.

Appellants argue that the arbitration clause is procedurally unconscionable because it is contained in a non-negotiable, take it or leave it, adhesion contract. They also argue that the arbitration clause is procedurally unconscionable because it is not readily visible to customers contracting for service via the Internet who must navigate to a separate page in order to see it. "A contract of adhesion is a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it." *Patterson v. ITT Consumer Financial Corp.*, 18 Cal.Rptr.2d 563, 565 (Cal. App. 1993) (citation and internal quotation marks omitted). Adhesion contracts are not *per se* improper. On the contrary, they are credited with significantly reducing transaction costs in many situations. *See Hill v. Gateway 2000, Inc.*, 105 F.3d 1147 (7th Cir. 1997). However, adhesion contracts are subject to abuse. Oppressive terms ancillary to the main bargain can be concealed in fine print and couched in vague or obscure contractual language. "In consumer transactions in particular, courts have been willing to scrutinize such contracts and have refused to enforce egregiously abusive ones." *Conseco*, 47 S.W.3d at 342 n. 20. (citing *Jones v. Bituminous Casualty Corp.*, 821 S.W.2d 798 (Ky. 1991)).

Upon review of the general provisions of the arbitration clause, we cannot conclude that it is procedurally unconscionable. The clause was not concealed or disguised within the form; its provisions are clearly stated such that purchasers of ordinary experience and education are likely to be able to

26

understand it, at least in its general import; and its effect is not such as to alter the principal bargain in an extreme or surprising way. As noted by the trial court "[t]he provision is in clear and concise language. The title is in bold print. The method of referring the reader to a different screen is a common practice in most web sites, and even in many written contracts (usually by reference to an addendum)." In summary, we do not find the arbitration clause to be procedurally unconscionable.

In light of *Concepcion,* we are constrained to further note that in future cases closer scrutiny of the positioning and prominence of class action waiver provisions will likely be necessary. Future application of *Concepcion* may be expected to limit the ability of consumers to band together under state law in a class action to vindicate important rights. It therefore follows that heightened attention should be afforded to providing a full and clear disclosure when those limitations are placed in adhesion contracts. It is fundamental that the prominence of the disclosure should be commensurate with the importance of the right being taken away.

### 2. *Substantive Unconscionability*

Substantive unconscionability "refers to contractual terms that are unreasonably or grossly favorable to one side and to which the disfavored party does not assent." *Conseco,* 47 S.W.3d at 343 n. 22 (citation omitted). As for substantive unconscionability, courts consider "the commercial reasonableness of the contract terms, the purpose and effect of the terms, the allocation of the

risks between the parties, and similar public policy concerns." *Jenkins*, 400 F.3d at 876.

The arbitration clause in this case is a basic arbitration clause permitting either side to compel arbitration. It has no unique characteristics to distinguish it from any other standard arbitration clause. Indeed, for the *de minimis* individual claims of this case, the customer is deprived of no right at all by the arbitration clause. With or without the arbitration clause, he is free to take his cause of action to small claims court, which would be the normal forum in Kentucky's court system for the individual's claim to be filed in any event. In summary, the general arbitration clause is not substantively unconscionable.

## D. Conclusion

As noted above, our state Constitution and statutes favor the enforceability of arbitration agreements. Moreover, the purpose of the FAA "was to reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements upon the same footing as other contracts." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991). The FAA's provisions "manifest a 'liberal federal policy favoring arbitration agreements.'" *Id.* at 25 (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, (1983)). The Supreme Court has "rejected generalized attacks on arbitration that rest on 'suspicion of arbitration as a method of weakening the protections afforded in the substantive law to would-be

28

complainants.'" *Green Tree Fin. Corp. v. Randolph*, 531 U.S. 79, 89-90 (2000) (quoting *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 481, (1989)); *Jenkins*, 400 F.3d at 874. In light of such long-standing public policy, we see no basis to disturb this contractual term.

## V. THE CONFIDENTIALITY PROVISION IS UNENFORCEABLE

Finally, the Appellants contend that the confidentiality provision contained in the arbitration agreement should be deemed unenforceable because it gives the company "an unyielding advantage over individual customers." They argue that as a repeat participant in the arbitration proceedings, the company is able to gather a body of information relating to precedent and rulings arising from within the dispute resolution process, to which customers involved in separate proceedings would have no access.[13]

Insight responds that, by extension, *Concepcion* prevents state courts from disturbing confidentiality agreements included within arbitration agreements. We disagree.

First, the subject matter of *Concepcion* is far removed from the issue of confidentiality agreements.[14] Further, the potential obstacles to arbitration

---

[13] As noted above, the arbitration agreement includes a severability provision which provides that "If any portion of this Dispute Resolution Section is determined to be unenforceable, then the remainder shall be given full force and effect. The provisions of this section shall survive termination, amendment or expiration of this Agreement." Accordingly, in striking down the confidentiality term, the remainder of the arbitration agreement remains unaffected.

[14] *Concepcion* does mention that with class-wide arbitration "[c]onfidentiality becomes more difficult." 131 S.Ct. at 1750. However, that certainly does not represent an indication that confidentiality agreements are likewise protected under the holding.

presented by the forbidding of class action waivers are simply not present in the case of confidentially provisions. While it is well-established that confidentially agreements may be enforceable to protect, for example, personal information or trade secrets; in situations like here, where such concerns are not present, the provision is wholly one-sided, protecting only the company that prepared the contract with no reciprocal benefit to the consumers. As such, we are not persuaded that *Concepcion* compels that we uphold the confidentiality agreement in this case. Accordingly, for the reasons explained below, and upon application of the substantive unconscionability principles as discussed above, we hold that the confidentiality agreement in this case is substantively unconscionable, and accordingly unenforceable against customers who opt for arbitration as a result of the internet outage.

Subsection (g) of the Dispute Resolution provisions, titled Arbitration Information and Filing Procedures, provides, in relevant part, that "[n]either you nor Insight may disclose the existence, content or results of any arbitration or award, except as may be required by law, to confirm and enforce an award, or to the party's attorneys and/or accountants." Although facially neutral, confidentiality provisions usually favor companies over individuals. *Ting v. AT&T*, 319 F.3d 1126, 1151 (9th Cir. 2003). It is generally recognized that because companies continually arbitrate the same claims, the arbitration process tends to favor the company. *Cole v. Burns Intern. Sec. Services*, 105 F.3d 1465, 1476 (D.C. Cir. 1997). In *Cole*, the D.C. Circuit held that because of plaintiffs' lawyers and arbitration appointing agencies like the American

Arbitration Association, who can scrutinize arbitration awards and accumulate a body of knowledge on a particular company, there was little likelihood of any harm occurring from the "repeat player" effect. *Id.* at 1486.

In *Ting*, however, the Ninth Circuit concluded that if a "company succeeds in imposing a gag order, plaintiffs are unable to mitigate the advantages inherent in being a repeat player." *Ting*, 319 F.3d at 1152. *Ting* concluded that such confidentiality clauses were unenforceable because it permitted the company to "place[] itself in a far superior legal posture by ensuring that none of its potential opponents have access to precedent while, at the same time, [the company] accumulates a wealth of knowledge on how to negotiate the terms of its own unilaterally crafted contract[,]" and because "the unavailability of arbitral decisions may prevent potential plaintiffs from obtaining the information needed to build a case of intentional misconduct or unlawful discrimination[.]" *Id.*

Further, "the secrecy provisions of the arbitration agreements both affect the outcomes of individual arbitrations and clearly favor Defendants. They do so by reinforcing the advantages Defendants already possess as repeat participants in the arbitration process." *Acorn v. Household Intern., Inc.*, 211 F.Supp.2d 1160, 1173 (N.D. Cal. 2002). "[S]everal studies have found and several courts have held that a party's repeated appearance 'before the same group of arbitrators conveys distinct advantages over the [one-time participant].' *Mercuro v. Superior Court*, 116 Cal.Rptr.2d 671, 678 (Cal. App. 2002)." *See also Sprague v. Household Intern.*, 473 F.Supp.2d 966, 975 (W.D.

31

Mo. 2005) (company has not explained why confidentiality agreements provide any real benefit, much less a comparable benefit, to the consumer and, as repeat players, the company is the obvious beneficiary of any attempt to obscure the process); *Luna v. Household Finance Corp. III*, 236 F.Supp.2d 1166, 1180 (W.D. Wash. 2002) ("The advantages repeat participants possess over "one time" participants in arbitration proceedings are widely recognized in legal literature and by federal courts."); *Armendariz v. Foundation Health Psychcare Services, Inc.*, 6 P.3d 669, 690 (Cal. 2000) (size of employee award in arbitration is lower when employer is a repeat participant); Bingham, "Employment Arbitration: The Repeat Player Effect," 1 Emp. Rts. & Employment Poly. J. 189, 213 (1997) (potential reasons for the repeat player advantage in arbitrations include: "unequal information in arbitrator selection," "unequal representation at the hearing," a repeat participant's ability to screen out and settle meritorious cases, and the arbitrator's incentive to satisfy repeat customers). Consequently, although facially neutral, the confidentiality provision of the arbitration agreement, in effect, favors Insight.

Insight directs us to *Iberia Credit Bureau, Inc. v. Cingular Wireless, LLC*, 379 F.3d 159, 175 (5th Cir. 2004) (while the confidentiality requirement is probably more favorable to the cellular provider than to its customer, the plaintiffs have not persuaded us that the requirement is so offensive as to be invalid.); *Parilla v. IAP Worldwide Services, VI, Inc.*, 368 F.3d 269, 280 (3rd Cir. 2004) (each side has the same rights and restraints under those provisions and there is nothing inherent in confidentiality itself that favors or burdens one

32

party vis-a-vis the other in the dispute resolution process.); and *Monroe v. Citigroup, Inc.*, 2003 U.S. Dist. LEXIS 26316 (N.D. Fla. Aug. 5, 2003). Nevertheless, Insight has failed to identify any practical social utility to the provision. In light of the substantial potential adverse consequences of the confidentiality provisions and the absence of countervailing benefits, we join those jurisdictions that hold that such provisions are unconscionable and unenforceable.

## VI. CONCLUSION

For the foregoing reasons, the decision of the Court of Appeals is affirmed in part, and reversed in part, and this matter is remanded to the Jefferson Circuit Court for entry of a final judgment consistent with this opinion.

Minton, C.J., Abramson, Cunningham and Scott, JJ., concur. Schroder, J., concurs in part and dissents in part by separate opinion, in which Noble, J., joins.

SCHRODER, J., CONCURRING IN PART AND DISSENTING IN PART: I concur with the well-reasoned opinion of the majority on all of the issues except as to the enforceability of the general arbitration clause and, by extension, as to the applicability of *AT&T Mobility LLC v. Concepcion*, ___ U.S. ___, 131 S.Ct. 1740 (2011). While I recognize the federal and state authorities favoring arbitration (including Kentucky Constitution Section 250), I believe that Insight's arbitration agreement is so procedurally unconscionable that the arbitration clause itself should be held invalid.

The majority accurately sets out the factors relevant to the procedural unconscionability inquiry – "the conspicuousness of the terms and comprehensibility of the contract language, the oppressiveness of the terms, and the presence or absence of a meaningful choice." *Jenkins v. First American Cash Advance of Georgia, LLC,* 400 F.3d 868, 875-76 (11th Cir. 2005). However, the Court's opinion does not address the last factor – whether the Appellants had a meaningful choice – which I see as critical to the analysis of unconscionability in this case.

The record established that Insight was the only provider of high-speed broadband cable internet services in Louisville at the time Appellants entered into the service agreements. Although there may have been other options to obtain internet access, the record indicates the service agreements for these companies had similar binding arbitration clauses or they did not provide high-speed broadband cable service. In the digital age in which we now live, internet access is becoming more and more of a necessity for personal communication, as well as for business and commerce purposes. The service agreement in this case was a "take it or leave it" adhesion contract that customers, who had no bargaining power, were forced to submit to if they wanted high-speed cable internet access. Unlike the appellees in *Conseco Finance Servicing Corp. v. Wilder,* 47 S.W.3d 335, 343 n.24 (Ky. App. 2001), who did not allege that there was not another reasonably available source for mobile home financing, Appellants in the present case have shown they had no meaningful choice in obtaining the high-speed internet service they sought.

34

The fact that the arbitration portion of the service agreement was not in the portion of the agreement asking for the customer's assent was further proof of its procedural unconscionability. Customers had to navigate to a separate page to see that portion of the agreement. While the majority notes that this is a common practice, it certainly cannot be characterized as conspicuous.

I would therefore hold that the arbitration agreement as a whole was procedurally unconscionable; given that conclusion, I do not believe this case falls under *Concepcion*. The issue in *Concepcion* was the *Discover Bank* rule, which essentially required the availability of classwide arbitration and invalidated arbitration agreement provisions to the contrary. The Supreme Court concluded that the *Discover Bank* rule "interferes with fundamental attributes of arbitration and thus creates a scheme inconsistent with the FAA." *Concepcion*, 131 S.Ct. at 1748. Such interference is not present when, as here, a particular arbitration agreement is unconscionable under the unique facts of that particular case.

The "saving clause" of the Federal Arbitration Act

> permits arbitration agreements to be declared unenforceable "upon such grounds as exist at law or in equity for the revocation of any contract." This saving clause permits agreements to arbitrate to be invalidated by "generally applicable contract defenses, such as fraud, duress, **or unconscionability**," but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue.

*Concepcion*, 131 S.Ct. at 1746 (quoting *Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 687 (1996)) (emphasis added). Insight's arbitration agreement is

unconscionable due to the absence of meaningful choice. As such, it is invalid under "generally applicable contract defenses," *id.*, and this conclusion is not the type of "state-law rule[] that stand[s] as an obstacle to the accomplishment of the FAA's objectives" decried in *Concepcion.* 131 S.Ct. at 1748 (citing *Geier v. American Honda Motor Co.*, 529 U.S. 861, 872, (2000); *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 372–73 (2000)).

For the above reasons, I would allow the class action suit in the Jefferson Circuit Court to go forward.

Noble, J., joins.

COUNSEL FOR APPELLANTS/CROSS-APPELLEES:
H. Philip Grossman
Jennifer Ann Moore
Grossman & Moore, PLLC
401 West Main Street, Suite 1810
Louisville, Kentucky 40202

Leslie A. Bailey
Public Justice
555 12th Street, Suite 1620
Oakland, California 94607

Frank Paul Bland, Jr.
Public Justice
1825 K Street NW, Suite 200
Washington, D.C. 20006

COUNSEL FOR APPELLEES/CROSS-APPELLANTS:
Laurence John Zielke
Nancy Jane Schook
Janice M. Theriot
David N. Hise
Zielke Law Firm, PLLC
Suite 1250
462 South Fourth Street
Louisville, Kentucky 40202

COUNSEL FOR AMICUS CURIAE - PACIFIC LEGAL FOUNDATION:
Bryon Edward Leet
Wyatt, Tarrant & Combs, LLP
500 West Jefferson Street
Louisville, Kentucky 40202-2898

Deborah Lafetra
Pacific Legal Foundation
3900 Lennane Drive, Suite 200
Sacramento, California 95834


COUNSEL FOR AMICUS CURIAE - AARP FOUNDATION LITIGATION:
Kenneth W. Zeller
AARP Foundation Litigation
601 E. Street, N.W.
Washington, D.C. 20049


COUNSEL FOR AMICUS CURIAE - THE KENTUCKY JUSTICE ASSOCIATION:
Kevin Crosby Burke
125 South 7th Street
Louisville, Kentucky 40202

John E. Spainhour, Jr.
Susan Shimp Torok
Givhan & Spainhour, PSC
Professional Building, Suite One
200 South Buckman Street
Shepherdsville, Kentucky 40165


COUNSEL FOR THE COMMONWEALTH OF KENTUCKY:
Jack Conway
Attorney General

Lisa Kathleen Lang
Craig Fletcher Newbern, Jr.
Assistant Attorney General
Office of the Attorney General
700 Capitol Avenue, Suite 118
Frankfort, Kentucky 40601