COUNSEL FOR APPELLANTS: Michael Farrell, Samantha Thomas-Bush, Farrell White & Legg PLLC, Amy B. Boyea, McDowell Hetherington, LLP.
COUNSEL FOR APPELLEE DRB CAPITAL, LLC: Matthew Beatty DeMarcus, Covington, Wolnitzek, Rowekamp & DeMarcus, PSC.
COUNSEL FOR APPELLEE RAY THOMAS, JR.: Charles Thomas Ezzell.
COUNSEL FOR AMICUS CURIAE NATIONAL STRUCTURED SETTLEMENTS TRADE ASSOCIATION: Walter L. Sales, William Jay Hunter, Jr., Louisville, Stoll Keenon Ogden PLLC.
COUNSEL FOR AMICUS CURIAE DEPARTMENT OF WORKERS' CLAIMS: Bradley Dale Hamblin, Jr.
OPINION OF THE COURT BY JUSTICE HUGHES
Ray Thomas, Jr. (Thomas) settled a workers' compensation claim against his employer and its workers' compensation insurer, National Union Fire Insurance Company (National Union). Less than six months after settling his claim, Thomas petitioned for, and received, the circuit *918 court's approval to transfer his future periodic payments to DRB Capital, LLC (DRB), in exchange for an immediate lump sum payment at a highly discounted rate. The circuit court approved the transfer pursuant to the Kentucky Structured Settlement Protection Act (KSSPA), which by its plain language applies only to structured settlements of tort claims. American General Annuity Service Corporation (AGASC), the entity obligated to make the periodic payments, and American General Life Insurance Company (American General), the issuer of the annuity to fund the payments, appealed the circuit court's transfer approval to the Court of Appeals. A divided Court of Appeals upheld the circuit court's approval despite explicit anti-assignability clauses in the underlying contracts, and statutory language limiting the KSSPA to tort settlements. American General and AGASC petitioned this Court for review, which we granted. After careful consideration, we conclude that the underlying contracts' antiassignment clauses are enforceable and the KSSPA does not apply to workers' compensation settlements. Accordingly, we reverse the Court of Appeals.
FACTS AND PROCEDURAL HISTORY
On May 12, 2015, Thomas, represented by counsel, settled a workers' compensation claim against his employer and its workers' compensation insurer, National Union Fire Insurance Company (National Union), pursuant to an Agreement as to Compensation and Order Approving Settlement ("Settlement Agreement"). The Settlement Agreement, approved by an Administrative Law Judge (ALJ), as required by Kentucky Revised Statute (KRS) 342.265, provided for a lump sum payment of $31,000, monthly payments of $960.23 for 20 years, and additional lump sum payments of $20,000 in 2024 and $25,000 in 2029 ("Periodic Payments"). The Settlement Agreement also stated that National Union could make a qualified assignment of its obligation to make the payments to American General Annuity Service Corporation (AGASC), which was permitted to fund the required payments by purchasing an annuity. In the Settlement Agreement, Thomas acknowledged and agreed to the following:
Payee [ (Thomas) ] acknowledges that the Periodic Payments cannot be accelerated, deferred, increased or decreased by any payee; nor shall any payee have the power to sell, mortgage, encumber, or anticipate the Periodic Payments, or any part thereof, by assignment or otherwise.
In a section titled "Consent to Qualified Assignment," the Settlement Agreement states that:
Payee [ (Thomas) ] acknowledges and agrees that [National Union] may make a 'qualified assignment,' within the meaning of Section 130(c) of the Internal Revenue Code... of the insurer's liability to make the Periodic Payments set forth above to American General Annuity Service Corporation.
As the Settlement Agreement allowed, National Union made a Uniform Qualified Assignment (UQA) to AGASC of its obligation to make the Periodic Payments to Thomas. The UQA also prohibits the assignment of the Periodic Payments. The UQA states as follows:
The Annuitant [Thomas] has no rights against the Assignee [AGASC] greater than a general creditor. None of the Periodic Payments may be accelerated, deferred, increased or decreased and may not be anticipated, sold, assigned or encumbered.
AGASC is the sole owner of the Annuity Policy that was purchased to make the *919 Periodic Payments. Under the Annuity Policy, American General makes the Periodic Payments to Thomas. The Annuity Policy states
No Payee [ (Thomas) ] or Beneficiary, of this policy shall have the power to commute or anticipate income payments. To the maximum extent permitted by law, payments will not be subject to:
1. Transfer (any attempt to make such transfer is void); or
2. Assignment (any attempt to make such assignment is void)
Further, the Annuity Policy contains a non-assignability clause which states that "[n]o Payee or Beneficiary of this policy has the power to assign any payments or benefits of this annuity policy. Any attempt to make an assignment is void." Although Thomas did not sign the UQA or the Annuity Policy, as outlined above, the Settlement Agreement expressly contemplated the possibility of a qualified assignment to AGASC and subsequent purchase of an annuity to fund the Periodic Payments.
Thomas sought to secure a lump sum payment in lieu of future annuity payments and entered into an agreement with DRB to transfer his rights to some of the Periodic Payments.[1] Citing the Kentucky Structured Settlement Protection Act (KSSPA), KRS 454.430 et seq. , DRB filed an Application for Approval of a Transfer of Structured Settlement Payment Rights. American General and AGASC opposed the settlement transfer, arguing that the transfer is void as a matter of law based on the express terms of the Settlement Agreement, the UQA and the Annuity Policy. On February 9, 2016, the Boyd Circuit Court entered an order approving the transfer to DRB. The circuit court stated that the transfer complied with the requirements of the KSSPA, was in Thomas's best interest, and was necessary to enable Thomas to avoid imminent financial hardship.
On American General and AGASC's appeal of the transfer approval, the Court of Appeals affirmed in a 2-1 decision. Because Kentucky Employers' Mutual Insurance v. Novation Capital, LLC, 361 S.W.3d 320 (Ky. App. 2011), had applied the KSSPA to a workers' compensation settlement, the Court of Appeals' opinion briefly addressed the applicability of the KSSPA and then focused on the anti-assignment provisions in the agreements. Persuaded by this Court's holding in Wehr Constructors, Inc. v. Assurance Co. of America, 384 S.W.3d 680 (Ky. 2012), that a non-assignability clause in an insurance policy is enforceable prior to a covered loss, but not after, the Court of Appeals determined that the anti-assignment clause in the Settlement Agreement (and the other two contracts) was unenforceable.[2] The Court of Appeals concluded that Thomas had a personal property interest in the Periodic Payments and such an interest *920 cannot be restrained from alienability.
In her dissent, Judge Clayton insisted that the majority read Wehr too broadly. Judge Clayton distinguished Wehr from Thomas's case, noting that the anti-assignment clause in his case was created after a loss occurred (his workplace injury), after Thomas prevailed on his claim, and after damages had been assessed. Thomas chose to enter the Settlement Agreement, with the anti-assignment provision, after he obtained a property right to the damages.
American General and AGASC petitioned this Court for discretionary review. Having granted the petition, we conclude the anti-assignment provision in the Settlement Agreement and the facts of this case are distinguishable from Wehr.
ANALYSIS
I. The Anti-Assignment Provisions in the Agreements Are Enforceable.
We begin with whether the anti-assignment provision in the Settlement Agreement executed by Thomas is enforceable under Kentucky law.[3] "[A] written agreement duly executed by the party to be held, who had an opportunity to read it, will be enforced according to its terms." Schnuerle v. Insight Communications Co., L.P., 376 S.W.3d 561, 575 (Ky. 2012) (quoting Conseco Fin. Servicing Corp. v. Wilder, 47 S.W.3d 335, 341 (Ky. App. 2001) ). Kentucky law has long held that anti-assignment clauses in contracts are enforceable. See Pulaski Stave Co. v. Miller's Creek Lumber Co., 138 Ky. 372, 128 S.W. 96, 101 (1910). ("[I]t seems to be well settled that a contract is generally assignable, unless forbidden by public policy or the contract itself...."). This is consistent with general contract principles as reflected in the Restatement (Second) of Contracts § 317 (1981) :
(2) A contractual right can be assigned unless
(a) the substitution of a right of the assignee for the right of the assignor would materially change the duty of the obligor, or materially increase the burden or risk imposed on him by his contract, or materially impair his chance of obtaining return performance, or materially reduce its value to him, or
(b) the assignment is forbidden by statute or is otherwise inoperative on grounds of public policy, or
(c) assignment is validly precluded by contract.
Despite these black-letter law principles, Thomas[4] now argues that the anti-assignment provisions in the Settlement Agreement and accompanying contracts are void as a matter of public policy, relying on Wehr. Before turning to that contention, we examine the language of the relevant contracts.
A. The language in the Settlement Agreement, UQA, and Annuity Policy is clear and unambiguous.
In the Settlement Agreement that Thomas signed, he expressly agreed that he had no "power to sell, mortgage, encumber, or anticipate the Periodic Payments, or any part thereof, by assignment *921 or otherwise." He further agreed that National Union could make a qualified assignment of its liability to make Periodic Payments to AGASC, and that AGASC could fund its liability to make the Periodic Payments through purchase of an annuity from American General. Thomas agreed, with the advice of counsel and acknowledgement from the ALJ, that signing the Settlement Agreement was in his best interest and that he understood the resulting legal implications. The Settlement Agreement he signed has a clear, unambiguous anti-assignment provision, a fact Thomas does not contest. The anti-assignment provisions in the UQA and the Annuity Policy, quoted above, are similarly clear and unambiguous, leaving little doubt about the correct outcome of this dispute unless the anti-assignment language is deemed void as against public policy.
B. Wehr 's holding regarding insurance policies is inapplicable to Thomas's case involving workers' compensation settlement payments.
Thomas's argument that the anti-assignment provision is void as a matter of public policy centers on this Court's decision in Wehr, 384 S.W.3d at 688. In Wehr, a hospital contracted with Wehr Constructors to perform floor installation as part of a hospital expansion project. Id. at 681. The hospital purchased a builder's risk insurance policy from Assurance Company of America, which stated: "Your rights and duties under this policy may not be transferred without [Assurance's] written consent except in the case of death of an individual named insured." After installation, a portion of the floor was damaged, and the hospital sought compensation under the builder's risk insurance policy, but Assurance denied the claim. Id. A payment dispute arose between Wehr and the hospital, which the parties ultimately settled. Id. at 682. As part of the settlement, the hospital assigned to Wehr any claim the hospital had against the insurance company under the builder's risk insurance policy. Id. When Wehr sued Assurance to recover payment due under the risk policy for the damaged floors, the insurance company immediately sought judgment on the pleadings, raising the anti-assignment provision in the insurance policy. Id. Assurance maintained that it did not consent to the assignment to Wehr and it was therefore unenforceable. Id.
The Court in Wehr was tasked with deciding
[w]hether an anti-assignment clause in an insurance policy that requires an insured to obtain the insurer's prior written consent before assigning a claim under the policy is enforceable or applicable when the claimed loss occurs before the assignment, or whether such a clause would, under those circumstances, be void as against public policy.
Id. at 681. In its analysis, the Court stated that "the courts that have considered this issue have overwhelmingly concluded that once an insured occurrence has transpired, the insured's claim then ripens into a chose in action, a type of personal property, which, pursuant to fundamental principles of debtor-creditor relationships, may not, ordinarily, be restrained from alienability." Id. at 685.
After considering both the majority and minority views, the Court determined that "a non-assignment clause in an insurance policy, while certainly enforceable prior to an occurrence of a covered loss, is not enforceable for assignments made after the occurrence."[5] Id. at 688 (emphasis in *922 original). Although the Court determined that the contract was not ambiguous, it held that the anti-assignment provision in that context, post-occurrence, was "unenforceable as against public policy." Id. at 687. The Wehr Court noted that the holding was consistent with "prior holdings adverse to contractual provisions tending to restrain the alienability of choses in action ...." Id. at 688 (emphasis supplied).
The Court of Appeals relied heavily on Wehr when reviewing this case. The appellate panel held that Thomas had a legitimate claim to his periodic payments just like a creditor in a debtor-creditor relationship and that his claim had "the hallmark of a personal property interest under Wehr " that cannot be restrained from alienability. We are compelled to hold otherwise because insurance policies and workers' compensation settlement agreements (and their accompanying assignment and annuity contracts) are different both in substance and treatment.
The Wehr Court drew an important distinction between enforcement of an anti-assignability clause in an insurance contract before a covered loss occurred and after. Assignment before a loss occurs would require the insurer to deal with someone other than the insured, essentially to contract with a party other than the one upon whom the underwriting decision was made. Public policy supports contractual provisions prohibiting the insured from foisting a stranger on the insurer. By contrast, when the loss has already occurred, the claim is a chose in action and the insurer is essentially a debtor whose liability is fixed. Allowing assignment is consistent with fundamental principles of debtor-creditor law and facilitates settlement of disputes, such as the one between the hospital and contractor in Wehr.
As Judge Clayton noted in her dissent in this case, Thomas entered into the Settlement Agreement, containing the anti-assignability language, after his loss occurred, after he prevailed on his workers' compensation claim and after his damages were assessed.[6] While the hospital's chose in action had just ripened in Wehr, Thomas's chose in action was fully resolved. Although the public policy holding in Wehr does not apply to the agreements in this case, if the reasoning were applicable, the anti-assignment provisions in the contracts before us would be enforceable. Thomas voluntarily entered into the Settlement Agreement after his workers' compensation loss occurred and specifically to resolve his chose in action (his workers' compensation claim). He expressly accepted the restraint on alienation of any and all periodic payments due to him as a result of his workers' compensation settlement. To the extent public policy plays a role in evaluation of the clear, unambiguous antiassignment provisions currently before us, as discussed below, it fully supports enforcement of the provisions.
C. Thomas's structured settlement agreement was specifically drafted and executed in contemplation of the favorable tax treatment provided by 26 U.S.C. §§ 104(a) and 130.
The Settlement Agreement, UQA, and Annuity Policy are of unique character, *923 carefully drafted in contemplation of the tax benefits provided by 26 U.S.C. §§ 104(a) and 130. Section 104(a) states, in relevant part, that gross income does not include "(1) amounts received under workmen's compensation acts as compensation for personal injuries or sickness; (2) the amount of any damages (other than punitive damages) received (whether by suit or agreement and whether as lump sums or as periodic payments) on account of personal physical injuries or physical sickness." Therefore, workers' compensation payees such as Thomas generally are entitled to receive their payments tax-free. As discussed below, if the payee is deemed to have constructive receipt or the present economic benefit of the structured future payments, then the exclusion under § 104 does not apply and the payee is taxed on the income.
Further, 26 U.S.C. § 130 states:
(a) In general.--Any amount received for agreeing to a qualified assignment shall not be included in gross income to the extent that such amount does not exceed the aggregate cost of any qualified funding assets.
This section further defines "qualified assignment" as follows:
(c) Qualified assignment.--For purposes of this section, the term "qualified assignment" means any assignment of a liability to make periodic payments as damages (whether by suit or agreement), or as compensation under any workmen's compensation act, on account of personal injury or sickness (in a case involving physical injury or physical sickness)--
(1) if the assignee assumes such liability from a person who is a party to the suit or agreement, or the workmen's compensation claim, and
(2) if--
(A) such periodic payments are fixed and determinable as to amount and time of payment,
(B) such periodic payments cannot be accelerated, deferred, increased, or decreased by the recipient of such payments,
(C) the assignee's obligation on account of the personal injuries or sickness is no greater than the obligation of the person who assigned the liability, and
(D) such periodic payments are excludable from the gross income of the recipient under paragraph (1) or (2) of section 104(a).
Section 130 allows an entity who undertakes the obligation of making periodic payments (here, AGASC) to exclude from its gross income the amount received for undertaking the payment obligation, to the extent that the amount does not exceed the cost of the funding asset (here, the annuity contract). For AGASC to exclude the amount it received from National Union to fund the annuity from its gross income, the payments Thomas is set to receive cannot be "accelerated, deferred, increased, or decreased." 26 U.S.C. § 130(c)(2)(B). If the payments were transferred, this provision is implicated and AGASC would lose its eligibility for the favorable tax treatment provided by § 130.
The periodic payment structure embodied in structured settlements serves a public policy purpose by providing income over the long-term for injured parties. As opposed to their receiving an immediate one-time payment, they are compensated for the injury and loss of earning capacity over a period of years. Preventing immediate access to a large settlement sum is especially important in the realm of workers' compensation, where injured workers may have no prospect of ever returning to work. These structured settlements not *924 only benefit the injured worker but help ensure that his or her family is provided for as well.
In recent years, structured settlement factoring transactions have increased significantly. Once structured settlement agreements are in effect, many personal injury plaintiffs seek to undo the deferred payment aspect of their settlements and instead access an immediate lump sum. Factoring companies are ready to accommodate these plaintiffs by offering immediate, but substantially discounted, lump sum payments in exchange for the face value of the future payment rights. However, such factoring agreements undermine one of the main purposes behind structured settlements for personal injury victims or injured workers - ensuring their long-term welfare. Consequently, most states have enacted some form of limitations or requirements for these structured settlement transfer agreements.[7] Significantly, factoring agreements also jeopardize the favorable tax treatment provided under 26 U.S.C. §§ 104 and 130, to the payee and payment obligor, respectively.
To receive favorable tax treatment, a structured settlement agreement must be drafted properly. As noted above, the Settlement Agreement in Thomas's case stated that the qualified assignment to AGASC must comply with the definition of "qualified assignment" in 26 U.S.C. § 130. In order to qualify under the definition in § 130, the periodic payments cannot be "accelerated, deferred, increased, or decreased by the recipient of such payments." 26 U.S.C. § 130(c)(2)(B). This requirement ensures that the payee will not be in constructive receipt or have the present economic benefit of the payments. If a payee is deemed to have actual or constructive receipt, or present economic benefit, then the party that accepted the qualified assignment and purchased an annuity to fund the payment obligations can be taxed on the amount it received and used to purchase the annuity. Additionally, the tax benefits afforded the injured worker under § 104(a) are denied if the payee has actual or constructive receipt of the money. 26 U.S.C. § 104(a) ; Rev. Rul. 79-220, 1979-2 C.B. 74. Notably, "income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions." 26 C.F.R. § 1.451-2. To avoid "present economic benefit" concerns, the payee must have no ownership or control of the annuity. Rev. Rul. 79-220, 1979-2 C.B. 74.
Here, the anti-assignment and anti-acceleration provisions that were included in the Settlement Agreement, UQA, and Annuity Policy impose substantial limitations and restrictions on Thomas by not allowing assignment or transfer of the Periodic Payments. He also has no ownership interest in the Annuity Policy. These provisions *925 are in place precisely to avoid constructive receipt and present economic benefit thereby protecting him, the payee, and obligated parties from unfavorable tax treatment. If Thomas were permitted to transfer his right to the Periodic Payments to DRB, he and AGASC would both be subject to taxation.
D. Although Wehr is not applicable, Liberty Assignment does address the issue presented.
Thomas insists that AGASC and American General's citation of Liberty Assignment Corp. v. Bluegrass Capital Group, LLC, 2011-CA-000852-MR, 2013 WL 1352095 (Ky. App. Apr. 5, 2013) violates Kentucky Rule of Civil Procedure (CR) 76.28(4)(c), which states that "Opinions that are not to be published shall not be cited or used as binding precedent in any court of this state ... [unless] there is no published opinion that would adequately address the issue before the court." Liberty Assignment is, however, an unpublished Court of Appeals' decision that is factually similar to Thomas's case and worthy of our consideration.
In Liberty Assignment, an injured worker settled his workers' compensation claim and subsequently sought to assign his rights to periodic payments to a factoring company despite anti-assignment language in the qualified assignment from the insurance company to a third party. 2013 WL 1352095, at *1. Although the worker only signed the underlying settlement agreement, and was not a party to the qualified assignment, the qualified assignment was incorporated into the settlement agreement, which stated that an annuity would be purchased to fund the periodic payments owed. Id. The Court of Appeals analyzed the validity of the anti-assignment clause and considered the Internal Revenue Code provisions allowing favorable tax treatment of periodic payments under structured settlements. Id. at *2-3. Holding that "the language of the qualified assignment contemplated the favorable tax treatment provided by the internal Revenue Code," the Court of Appeals determined that the anti-assignment provision was enforceable. Id. at *3.
Thomas argues that because Wehr adequately addresses the antiassignment issue before this Court, his opponents' citation of this unpublished case violated CR 76.28. As discussed above, the Wehr case is inapplicable to Thomas's case. By contrast, Liberty Assignment is on point and citation was permissible. Liberty Assignment appropriately recognized, as we now do, that favorable tax treatment encourages structured settlements for the benefit of injured parties, and respecting anti-assignment provisions necessary to secure that favorable treatment is important for the benefit of all involved.
E. Section 5891 of the Internal Revenue Code does not affect our analysis.
Thomas insists that the reasoning in Liberty Assignment , reasoning we adopt today, has been undermined by another federal statute. Specifically, 26 U.S.C. § 5891, imposes a 40 percent excise tax on anyone who acquires, directly or indirectly, structured settlement payment rights in a factoring transaction, unless the acquired payment rights complied with the state's structured settlement protection act. Pursuant to this statute, the structured settlement factoring transaction will not adversely affect the tax treatment of the parties to the settlement under §§ 104 and 130 if the requirements under those sections were satisfied when the parties entered the agreement. Contrary to Thomas's argument, § 5891 does not relax any of these requirements, including the requirement *926 that a payee not have constructive receipt or the present economic benefit of the amounts under the settlement. Addressing a similar matter, the Illinois Court of Appeals stated:
Rapid Settlements argues that the Victims of Terrorism Tax Relief Act of 2001 (Pub.L. No. 107-134, 115 Stat. 2427 (to be codified at 26 U.S.C. § 5891(b)(2)(A) (2006) ) ) invalidates the antiassignment provision because it eliminates an obligor's concerns about potential tax liability when an obligee attempts to assign a structured settlement agreement. The Victims of Terrorism Tax Relief Act only specifies what tax treatment certain kinds of structured settlements will be afforded; it leaves to the individual states the question of assignability. The clear and unambiguous language of the settlement agreement controls our analysis here.
In re Foreman, 365 Ill.App.3d 608, 302 Ill.Dec. 950, 850 N.E.2d 387, 391 (2006).
As AGASC and American General aptly note, this section merely addresses the tax treatment a structured settlement transfer receives, not whether the transfer is valid. The attempted transfer in this case is not valid because it violates enforceable anti-assignment provisions.
II. The Kentucky Structured Settlement Act Does Not Apply to Workers' Compensation Settlements.
Aside from the anti-assignment provisions, this case requires us to consider whether the KSSPA applies in these circumstances. The application of the KSSPA to workers' compensation settlements is an issue of statutory construction that is reviewed de novo. Maynes v. Commonwealth, 361 S.W.3d 922, 924 (Ky. 2012). This Court has recognized that the Workers' Compensation Act is legislation resulting from a compromise between employers and employees. Labor Ready, Inc. v. Johnston, 289 S.W.3d 200 (Ky. 2009). "Workers agree to forego common law remedies in exchange for statutory benefits awarded without regard to fault. Employers agree to pay such benefits and to forego common law defenses in exchange for immunity from tort liability ." Id. at 204 (emphasis supplied). One of the purposes of the Workers' Compensation Act is "to extend benefits to employees without the need to prove fault, while protecting employers from tort liability." Falk v. Alliance Coal, LLC, 461 S.W.3d 760, 765 (Ky. 2015).
A. The plain language of the KSSPA indicates that the act does not apply to workers' compensation settlements.
The KSSPA is codified in KRS 454.430 through 454.435. KRS 454.430 includes the following relevant definitions for the KSSPA:
(4) "Qualified assignment agreement" means an agreement providing for a qualified assignment that meets the requirements of Section 130 of the Internal Revenue Code, 26 U.S.C. sec. 130, as amended from time to time;
(5) "Settled claim" means the original tort claim resolved by a structured settlement;
(6) "Structured settlement" means an arrangement for periodic payment of damages for personal injuries established by settlement or judgment in resolution of a tort claim ";
.....
(8) "Structured settlement payment rights" means rights to receive periodic payments, including lump sum payments under a structured settlement, whether from the settlement obligor or the annuity issuer, where:
*927 (a) The payee or any other protected party is domiciled in this state; or
(b) The settled claim was pending before the courts of this state when the structured settlement was reached[.]
(Emphasis supplied.) By its plain language, the KSSPA applies only to the transfer of payment rights under a tort settlement reached while the plaintiff's claim was pending in Kentucky courts. The definition for structured settlement refers to periodic payment of damages for personal injuries established in resolution of a "tort claim." An employee who receives workers' compensation through settlement or an award has not resolved a tort claim, but rather has pursued a statutory recovery.
Workers' compensation was designed to be an exclusive avenue of recovery for injured workers, an avenue that does not require the worker to prove the employer's negligence but rather just the work-related nature of the injury. See KRS Chapter 342. Thomas argues that Kentucky law treats settlement of workers' compensation claims as "tort claims" that are addressed through a separate statutory framework, relying on language in Dix & Associates Pipeline Contractors v. Key, 799 S.W.2d 24 (Ky. 1990). Dix states that
[i]n this case, what otherwise would have been tort liability of Dix & Associates to the injured worker has been extinguished by reason of the workers compensation coverage. As a practical matter, workers compensation coverage constitutes a settlement between the employee and the employer whereby the employee settles his tort claim for the amount he will receive as compensation.
Id. at 29. However, this Court interprets this line of reasoning to mean that in the realm of work-related injuries what ordinarily would be considered a tort claim is instead completely removed from tort and placed into a specially designed statutory framework - the Workers' Compensation Act.[8] Any tort claim the employee may have had against his employer is extinguished by workers' compensation.
As emphasized repeatedly by this Court, "[w]orkers' compensation is a statutory creation under which workers and employers agree to forego common law remedies/liability for workplace injuries and to subject themselves to the provisions of Chapter 342." Millersburg Military Institute v. Puckett, 260 S.W.3d 339, 341 (Ky. 2008). In a tort claim, the claimant must prove duty, breach, causation and damages. In contrast, workers' compensation is a system designed to compensate injured workers for necessary treatment and loss of earning capacity without regard to fault.[9] Additionally, KRS 342.180 states *928 that generally, no claim for compensation under the workers' compensation statutes is assignable. The purpose of the statutory prohibition against assigning workers' compensation claim is to protect the injured worker and to insure that benefits are available for food, clothing, and shelter, rather than antecedent debts. Newberg v. Sarcione, 865 S.W.2d 317, 319 (Ky. 1993).
Despite the clear statutory language of the KSSPA regarding tort claims settled in court, Thomas points to the KSSPA definition of "qualified assignment agreement" as an "agreement providing for a qualified assignment that meets the requirements of Section 130 of the Internal Revenue Code." KRS 454.430(4). From this reference to the Revenue Code, Thomas reasons that the KSSPA was intended to apply to any structured settlement designed to meet the requirements of § 130. Plainly, that is not the case. The express references in KRS 454.430(5) and (6) to a "tort claim" and the requirement in KRS 454.430(8)(b) that the settled claim be pending in a Kentucky court before the structured settlement was reached preclude application of the KSSPA to workers' compensation structured settlements.
Thomas also references the language of § 130 of the Internal Revenue Code which includes "compensation under any workmen's compensation act" in its definition of "qualified assignment agreement." Thomas argues that since the KSSPA refers to a section in the Internal Revenue Code that includes workers' compensation that further reflects the KSSPA is meant to apply to structured settlements in workers' compensation cases. We again disagree. The Internal Revenue Code is a federal law that must be inclusive throughout the United States, and numerous states, unlike Kentucky, explicitly include workers' compensation in their structured settlement protection acts. The Internal Revenue Code includes workers' compensation structured settlements in its definition for those states where workers' compensation settlements are covered in their versions of a structured settlement protection act. In sum, reference to § 130 does nothing to change the scope of the KSSPA; it does not apply to workers' compensation settlements.
B. The legislative history of the KSSPA strengthens the conclusion that the KSSPA does not apply to workers' compensation settlements.
The language of the KSSPA could not be clearer - it is applicable only to tort claims. "Because the language of the statute is abundantly clear, we need not resort to extrinsic aids to its interpretation. Nonetheless, the legislative history is enlightening and serves only to strengthen our foregoing conclusion, and for this reason we reference it." Stephenson v. Woodward, 182 S.W.3d 162, 172 (Ky. 2005).[10]
When the KSSPA was introduced in January 1998 as House Bill 312, it included the following definitions:
"Structured settlement" means an arrangement for periodic payment of damages for personal injuries established by *929 settlement or judgment in resolution of a tort claim or for periodic payments in settlement of a workers' compensation claim[.] "Settled claim" means the original tort claim or workers' compensation claim resolved by a structured settlement.
Journal of the House of Representatives of the General Assembly of the Commonwealth of Kentucky, Regular Session, vol. II at 2752 (1998). Thus, our legislature originally contemplated the inclusion of workers' compensation settlements in the KSSPA, but ultimately removed those settlements from the statute. The final version of the KSSPA that exists today refers exclusively to tort claims in defining structured settlement and settled claim. While resort to legislative history is unnecessary in this case, it does ultimately "strengthen our ... conclusion." Stephenson, 182 S.W.3d at 172.
C. The circuit court has no authority over a petition to transfer structured settlement payment rights arising from a workers' compensation claim.
Finally, Thomas cites Kentucky Employers' Mutual Insurance v. Novation Capital, LLC, 361 S.W.3d at 320, for the proposition that the circuit court had jurisdiction under the KSSPA to approve the transfer of his Periodic Payments. In Kentucky Employers' Mutual, the Court of Appeals determined that the circuit court had subject-matter jurisdiction to approve a petition to transfer structured settlement payment rights arising from a workers' compensation claim. Id. at 321. Confronted with the argument that the payee's claim for benefits was within the exclusive jurisdiction of the Workers' Compensation Board, the Court of Appeals held that the petition for transfer "did not request that any matter relating to a workers' compensation claim be litigated." Id. The appellate court reasoned that the workers' compensation claim was finalized, and the KSSPA provided jurisdiction to the circuit court to approve transfer of the payment rights. Id. at 322.
As noted, based on clear statutory language, the KSSPA applies only to the transfer of payment rights under a tort settlement, not the transfer of payment rights under workers' compensation settlements. To the extent Kentucky Employees' Mutual Insurance v. Novation Capital, LLC holds otherwise it is hereby overruled.
CONCLUSION
The Settlement Agreement, UQA, and Annuity Policy each contain clear language prohibiting an assignment of the Periodic Payments. In the underlying Settlement Agreement, Thomas expressly agreed to a restriction on assignment. While restrictions on alienability of certain types of personal property rights are typically disfavored, structured settlements of workers' compensation claims are of a unique character and restrictions on the assignment and transfer of payments preserve the intended favorable tax treatment and assure the continued support of injured workers. The antiassignment provisions at issue in this case are enforceable. Moreover, because Thomas's payment rights were the result of a workers' compensation claim, not a tort claim, the KSSPA does not apply.
For the foregoing reasons, we reverse the Court of Appeals and remand to the circuit court for further proceedings consistent with this Opinion.
All sitting. All concur.

The Absolute Sale and Security Agreement Thomas entered with DRB states that Thomas agreed to sell all his rights to and interest in the following payments Thomas was due to receive: 120 monthly payments of $480.23 (approximately 1/2 of his monthly payments under the Settlement Agreement) and the $20,000 lump sum due and payable in 2024. In exchange for selling and transferring these payment rights to $77,627.60, DRB agreed to pay Thomas $35,086.64.

As a matter of public policy, "once an insured occurrence has transpired, the insured's claim then ripens into a chose in action, a type of personal property, which, pursuant to fundamental principles of debtor-creditor relationships, may not, ordinarily, be restrained from alienability." Wehr, 384 S.W.3d at 685.

The primary anti-assignment clause is the one in the Settlement Agreement that Thomas signed but the two other underlying contracts, the UQA and the Annuity Policy, also had anti-assignment clauses as quoted above. We ultimately address all three anti-assignment provisions.

Thomas and DRB are both appellees on this appeal but only Thomas filed a brief.

Again, the majority view recognizes the insured's post-occurrence claim as a chose in action, "a type of personal property, which, pursuant to fundamental principles of debtor-creditor relationships, may not, ordinarily, be restrained from alienability." Id. at 685. In contrast, the minority rule states that "the unambiguous language of an anti-assignment clause, like the one present in this case, should be enforced as written." Id.

The Settlement Agreement states that "[a]ll sums set forth herein constitute damages on account of personal injuries and sickness ... within the meaning of Section 104(a)(1) of the IRC."

Most states have responded to the concerns caused by factoring transactions by enacting their own structured settlement protection acts. At least 44 states have some type of structured settlement protection act. See, e.g., Cal. Ins. Code §§ 10134 to 10141 (West 2009) ; Conn. Gen. Stat. Ann. § 52-225f (West 2018) ; Ga. Code Ann. §§ 51-12-70 to 73, 51-12-7 to 77 (West 2015) ; Kan. Stat. Ann. § 40-461 (West 2018) ; Me. Rev. Stat. Ann. tit. 24-A, §§ 2241, 2243, 2245 -46 (2018); Minn. Stat. Ann. §§ 549.30 to 549.33 (West 2018) ; Mo. Ann. Stat. §§ 407.1060, .1062, .1064, .1066, .1068 (West 2018); N.C. Gen. Stat. Ann. §§ 1-394.1, 1-543.10 to .15 (West 2018); 40 Pa. Stat. Ann. § 4003 (West 2018) ; Va. Code Ann. §§ 59.1-475 to .477 (West 2018); W. Va. Code Ann. §§ 46A-6H-1 to 8 (West 2018). Although the state statutes are not all uniform, most were inspired by model legislation promulgated by the National Structured Settlements Trade Association. Daniel W. Hindert & Craig H. Ulman, Transfers of Structured Settlement Payment Rights What Judges Should Know About Structured Settlement Protection Acts, 44 Judges' J. 19, 20-21 (Spring 2005).

The Department of Workers' Claims is responsible for administering all claims for compensation brought under the Workers' Compensation Act. The Department employs ALJs to perform duties assigned to them by statute, such as conducting hearings, reviewing agreements, and approving claims that comply with KRS Chapter 342. KRS 342.230, 342.265. The only jurisdiction provided to circuit courts regards enforcing an approved agreement or a decision to award benefits rendered by the ALJ. KRS 342.305.
An ALJ's decision may be appealed to the Workers' Compensation Board. If a claimant is dissatisfied with the results of that review, the Board's decision is then appealable to the Court of Appeals. The Court of Appeals' decision is then subject to a matter of right appeal to this Court. Nowhere in Chapter 342 did our legislature allow for a circuit court to have jurisdiction over workers' compensation claims other than to enforce an agreement between the parties or a benefit award.

To further illustrate the distinction between tort claims and workers' compensation, Thomas's underlying injury was the result of him applying too much pressure to a ratchet and injuring his right shoulder and neck. There is no tortfeasor in this scenario, only a work-related injury.

In the interpretation of statutes, the function of this or any court is to construe the language so as to give effect to the intent of the legislature. There is no invariable rule for the discovery of that intention. The actual words used are important but often insufficient. The report of the legislative committees may give some clue. Prior drafts of the statute may show where meaning was intentionally changed. Bills presented but not passed may have some bearing.
Fiscal Court of Jefferson County v. City of Louisville, 559 S.W.2d 478, 480 (Ky. 1977).