RENDERED: JUNE 2, 2023; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2022-CA-0270-MR

DELENE ANN GILKERSON                                      APPELLANT


|  | APPEAL FROM ROWAN CIRCUIT COURT |
|---|---|
| v. | HONORABLE ROBERT W. MCGINNIS, JUDGE |
|  | ACTION NO. 18-CI-00152 |


CHARLES RANDALL GILKERSON
AND HON. PAULA RICHARDSON
BARBER                                               APPELLEES


OPINION
AFFIRMING

** ** ** ** **

BEFORE: ACREE, EASTON, AND JONES, JUDGES.

JONES, JUDGE: This is an appeal from a decree of dissolution entered by the Rowan Circuit Court. The appellant, Delene Gilkerson ("Delene"), contends the circuit court erred by: (1) enforcing an oral settlement agreement she made in open court with her now ex-husband, appellee Charles Randall Gilkerson

("Randy"), regarding their division of marital assets; (2) declining to require Randy to pay her attorney's fees; and (3) requiring her to pay $2,500 of Randy's attorney's fees as a contempt sanction. The specifics of her contentions are addressed in turn below. In sum, her arguments lack merit. Hence, we affirm.

## I. ENFORCEMENT OF THE ORAL SETTLEMENT AGREEMENT

### A. Overview

Delene and Randy married on February 14, 2005. They had no children together. In June 2018, following a requisite period of separation, each petitioned the Rowan Circuit Court to dissolve their marriage and equitably divide their marital estate. On September 11, 2019, following a period of discovery and motion practice, the circuit court held a hearing wherein the parties, after being duly sworn, outlined the particulars of an agreement they had made regarding the division of their marital property. Because it is pertinent to many of the issues presented in this matter, we set forth the relevant substance of what was stated at that hearing:

> RANDY'S COUNSEL: Is it your understanding that we have come to a settlement agreement as far as the division of the assets?
>
> RANDY: Yes.
>
> RANDY'S COUNSEL: Okay. I'm going to read that into the record, Randy, and I may ask you a couple questions about that.

RANDY:  Okay.

COURT:  Okay, before you do that, Ms. Gilkerson, do you agree with the testimony he's given so far?

DELENE:  Yes.

. . .

COURT:  Okay.  And listen carefully to what's stated as the agreement to make sure you agree with it, okay?

DELENE:  Okay.

COURT:  Go ahead.

RANDY'S COUNSEL:  Is it your understanding that as a division of the marital estate, that Delene Gilkerson will receive, or has already in her possession some of these assets:  $50,000 from the joint bank account?

RANDY:  Yes.

RANDY'S COUNSEL:  And that's the Whitaker Bank?

RANDY:  Yes.

RANDY'S COUNSEL:  The, she will receive the property that we're calling the East Point property?

RANDY:  Eastwood.

RANDY'S COUNSEL:  Eastwood, thank you, at a value of $110,000?

RANDY:  Yes.

RANDY'S COUNSEL: That she will receive her retirement that's invested with Pantera [*sic*[1]] that has a current value of $48,800?

RANDY: Yes.

RANDY'S COUNSEL: That she has already received $150,000 from the joint Whitaker Bank account?

RANDY: Yes.

RANDY'S COUNSEL: That in addition she will receive the household goods and furnishings that are at the Country Club, 375 Country Club address at a value of $25,000?

RANDY: Yes.

RANDY'S COUNSEL: That she will receive the Country Club residence at a value of $329,000?

RANDY: Yes.

RANDY'S COUNSEL: That she has up to a period of one year to do either one of two things, Randy. She has to sell the property, or if she decides she wants to retain it she has to pay you the sum of $126,000?

RANDY: Yes.

RANDY'S COUNSEL: And you have agreed not to charge her any interest on that $126,000?

RANDY: Yes.

RANDY'S COUNSEL: In addition, she would receive a condominium at Saint James Court, valued at $110,000,

_____

[1] The parties agree that Delene's retirement was invested with an entity named "Pentegra," not "Pantera."

-4-

and she agrees that you would have two weeks from the date of the decree to remove your personal items from that condominium?

RANDY: Yes.

RANDY'S COUNSEL: That she would also receive the property located on Whitaker Street at a value of $126,000?

RANDY: Yes.

RANDY'S COUNSEL: That she's receiving assets in the amount of $948,000?

RANDY: Yes.

RANDY'S COUNSEL: And the flipside of that is, every other asset that you have, that you all have accumulated together, becomes your asset as the division of the marital estate? These things would be restored to you. You have two separate bank accounts at US Bank, Randy?

RANDY: Yes.

RANDY'S COUNSEL: And those would be restored as your separate property, correct?

RANDY: Yes.

RANDY'S COUNSEL: And Delene has two separate bank accounts at Whitaker Bank?

RANDY: Yes.

RANDY'S COUNSEL: She also has a certificate of deposit in the amount of $8,700. Those three accounts would all be restored to her as her separate assets. Is that your understanding also?

RANDY:  Yes.

RANDY'S COUNSEL:  And that you all have agreed to divide the vehicles, and you all have agreed that is an equal division.  In other words, Delene receives, can you tell the court the assets that she receives as far as vehicles?

RANDY:  She receives a 2012 Cadillac and a 2005 Mercedes.

RANDY'S COUNSEL:  Okay.  And all the other vehicles would become your property with the exception of the vehicle that you all both agreed was going to be the property of her daughter?

RANDY:  Yes.

. . .

RANDY'S COUNSEL:  And then if, like I said, any other asset would become yours?

RANDY:  Yes.

RANDY'S COUNSEL:  That's your understanding.  Um, and let's just run through those to make sure that we're on the same page, okay Randy?

RANDY:  Okay.

RANDY'S COUNSEL:  That you would receive a TD bank account, that's the Florida bank account.  You would receive all of the Charles Schwab bank account.  You would receive all of the Merrill Lynch account, which actually is your retirement account, part of which was marital, part of which was nonmarital, but you're gonna receive all of that.

RANDY:  Yes.

RANDY'S COUNSEL: You would receive the proceeds from the sale of 1184 McBrayer, and those proceeds are $90,013.96, that are sitting in the Richardson, Barber, and Williamson escrow. And you would receive the McBrayer, the other McBrayer property, which we valued at $162,000. And you would receive the condominium at Titusville, Florida, at 2124 King's Cross, that's valued at $130,000. And you would also receive the household goods and furnishings at the Florida condominium.

RANDY: Yes.

RANDY'S COUNSEL: Is that correct, Randy?

RANDY: Yes.

RANDY'S COUNSEL: Is there anything that I've omitted –

RANDY: No, I don't –

RANDY'S COUNSEL: That you can think of?

RANDY: I don't think so.

RANDY'S COUNSEL: And based upon your agreement, do you believe that this is a just division of the marital estate?

RANDY: Yes.

RANDY'S COUNSEL: Okay. And you are agreeable to that?

RANDY: Yes.

RANDY'S COUNSEL: You are agreeable to execute whatever documents are necessary to convey title to Ms. Gilkerson?

RANDY:  Yes.

RANDY'S COUNSEL:  For the assets she is to receive?

RANDY:  Yes.

The parties also stated they would file a joint tax return, and that if there were any liability or refund, it would go to Randy; and that Delene's daughter would receive a grand piano.  The hearing then proceeded in relevant part as follows:

COURT:  Okay.  Does that complete everything?

RANDY:  Yes.

COURT:  Okay.  And Ms. Gilkerson, do you agree with everything your husband, or actually, your husband's attorney just stated –

DELENE:  Yes.

COURT:  As far as property settlement?

DELENE:  Yes.

COURT:  Okay.  And you believe that's fair to both of you?

DELENE:  Yes.

COURT:  Okay.  I'll find it to be so.  The separation agreement, once it comes in, assuming it parrots what we just heard, will be approved, and the final decree will be entered at that time.  So as soon as you all get this in, we'll process it quickly.

RANDY'S COUNSEL:  So am I understanding the court that it would not entertain, the court would not entertain the entry of a decree of dissolution of the parties' marriage today if I provide one?

DELENE'S COUNSEL:  If you can get it done.

RANDY'S COUNSEL:  If I can provide one without –

COURT:  No.  Everything has to be resolved.

RANDY'S COUNSEL:  Okay.

COURT:  I won't split it.

DELENE'S COUNSEL:  Do what now?  Sorry.  I didn't hear.

RANDY'S COUNSEL:  He's basically saying he won't allow us to enter the decree –

DELENE'S COUNSEL:  So everything until –

COURT:  Until we've got the separation agreement executed.

DELENE'S COUNSEL:  – separation agreement signed? Okay.

RANDY'S COUNSEL:  Okay.

COURT:  I allowed that to be done one time, thirty[-]some years ago, and it blew up.

Randy filed a transcript of the September 11, 2019 hearing with the

circuit court's record without objection, and his counsel drafted a proposed

dissolution decree that incorporated the property settlement agreement the parties

had described to the circuit court. However, when presented with Randy's proposed decree, Delene refused to approve it. Notwithstanding, Randy moved the circuit court to approve the parties' agreement that was made on the record, and to incorporate it into the final dissolution decree; and the circuit court ultimately did so.

### B. Issues

Delene refused to give her approval of Randy's proposed decree for two overarching reasons – reasons the circuit court rejected, and which she now reasserts before this Court as primary focuses of her appeal. In her view: (1) she and Randy never effectively formed a property settlement agreement at the September 11, 2019 hearing; and (2) even if such an agreement had been effectively formed, it was nevertheless unenforceable because it was unconscionable. As this matter was resolved through a bench trial, we note at the onset that factual findings of the trial court are reviewed under the clearly erroneous standard of Kentucky Rule of Civil Procedure ("CR") 52.01, but the trial court's legal conclusions are reviewed *de novo* as an issue of law. *Smith v. Smith*, 235 S.W.3d 1, 6-7 (Ky. App. 2006).

1. Whether the circuit court erred in determining Delene and Randy formed a property settlement agreement

"[T]he issue of contract formation . . . is a question of law to be reviewed de novo, where, as here, the relevant facts are undisputed." *Baumann*

-10-

*Paper Co., Inc. v. Holland*, 554 S.W.3d 845, 848 (Ky. 2018), *as modified on denial of reh'g* (Sep. 27, 2018). "The fundamental elements of a valid contract are offer and acceptance, full and complete terms, and consideration. For the terms to be considered complete they must be definite and certain and must set forth the promises of performance to be rendered by each party." *Energy Home, Div. of Southern Energy Homes, Inc. v. Peay*, 406 S.W.3d 828, 834 (Ky. 2013) (internal quotation marks and citations omitted).

In support of her assertion that she and Randy never effectively formed a property settlement agreement, Darlene's argument, as set forth in her appellate brief, is as follows:

> On September 11, 2019, the trial court refused to enter a Decree of Dissolution until everything was "resolved" as a separation agreement had not been "executed." (9-11-19 TR at 11:58:53-11:59:11 and 11:59:17-19). Additionally, at the December 10, 2020 hearing, the trial court noted that there was an "oral agreement" that was read into the record, which was never reduced to writing. In noting that oral agreements that are read into the record, estates like Delene's and Randy's is atypical, the trial court denied enforcement of the agreement, stating that this, "kicks us right back to square one." (12-10-20 TR at 11:01:46-11:02:55). Further, the court stated that the date of the final hearing shall be the date of the valuation of the assets. (12-10-20 TR at 11:04:00-10). Admittedly, the trial court entered an order, setting a hearing, "in order to make a determination on whether the agreement was unconscionable." *See* January 15, 2020 Order, ROA at 436-437.

Notwithstanding the trial court's January 15, 2020 Order, it does appear that the trial court initially, and subsequently, treated the matter as if there was no finalized and formalized agreement. The trial court specifically noted that it would not enter a Decree of Dissolution until the agreement had been executed and followed this up by stating that the agreement had never been reduced to writing. Given the nature of Delene and Randy's estate, this analysis is logical. Finally, as the trial court was going to base its ultimate analysis on values as of the date of a final hearing, it cannot be said that an agreement existed as the values would be necessarily significantly different than those on September 11, 2019. For all of these reasons, it is evident that no agreement existed between the parties.

Delene is effectively arguing that no property settlement agreement was effectively formed because: (1) at the September 11, 2019 hearing, the circuit court directed the parties to execute a written agreement, which the parties failed to do; (2) after the September 11, 2019 hearing, the circuit court "treated the matter as if there was no finalized and formalized agreement" and "denied enforcement"; and (3) the parties never agreed that the value of the assets contemplated in their agreement would be the value of those assets as of the date of the circuit court's final hearing in this matter, April 29, 2021.

As to the first and second points of Delene's argument, we disagree. The legal requirement for parties to form and execute a "written" property settlement agreement in this context derives from Kentucky Revised Statute ("KRS") 403.180(1) and is satisfied where an oral agreement is stated on the

-12-

record in the presence of the judge or transcribed by a court reporter and made part of the record. *Calloway v. Calloway*, 707 S.W.2d 789, 791 (Ky. App. 1986). Here, the circuit court indicated at the September 11, 2019 hearing that it would not *incorporate* any agreement made by the parties *into its decree* unless the agreement was in writing and signed by the parties. At no point, however, did the circuit court hold that the parties failed to form an agreement; nor, as evidenced by its final judgment, did it treat this matter as if there was no finalized and formalized agreement. Indeed, the circuit court ultimately set aside its interlocutory directive for the parties to formally memorialize their agreement in written form, and instead recognized what transpired at the September 11, 2019 hearing as the effective formation of a finalized and formalized property settlement agreement. Interlocutory orders are subject to revision; and, if the parties effectively formed a contract during the September 11, 2019 hearing, it was the circuit court's prerogative to set aside its interlocutory directive requiring the parties to execute a separate, written agreement.

This leads to Delene's third point. She takes issue with the fact that the parties' agreement, as stated on the record at the September 11, 2019 hearing, did not provide that the parties' assets would be valued as of the date of the circuit court's final hearing in this matter, *i.e.*, April 29, 2021. Considering this perceived

-13-

deficiency, Delene appears to be asserting that a material term was missing from the parties' stated agreement.

We disagree. Delene and Randy stated on the record that they were aware of what their marital assets were; that their agreement contemplated all their assets and that nothing had been omitted; and further, they exchanged promises regarding how their marital assets would be divided. The essentials of a contract (offer, acceptance, and consideration) were accordingly present, and the assets contemplated in their agreement were reasonably ascertainable. As for the *valuation* of the parties' marital assets and the date from which it was determined, Delene is correct that it was relevant, but it was relevant to an issue other than contract formation. After Delene moved to set the agreement aside, the proceedings were governed by KRS 403.180(2), which provides:

> In a proceeding for dissolution of marriage or for legal separation, the terms of the separation agreement, except those providing for the custody, support, and visitation of children, are binding upon the court unless it finds, after considering the economic circumstances of the parties and any other relevant evidence produced by the parties, on their own motion or on request of the court, that the separation agreement *is unconscionable*.

(Emphasis added.)

The doctrine of unconscionability would apply, for example, if there was a substantial change in the parties' circumstances or the value of their assets between when the parties effectuated their agreement and when their divorce was

-14-

granted, rendering their agreement manifestly unfair or unreasonable. *See Mays v. Mays*, 541 S.W.3d 516 (Ky. App. 2018). "Unconscionability" does not, however, indicate whether a contract was formed; it is merely a basis for declaring an already-formed contract voidable – that is, legally enforceable unless it is voided at the other party's option – rather than void *ab initio*. *See* 8 WILLISTON ON CONTRACTS § 18:1 (4th ed.). In sum, we find no error in the circuit court's determination that the parties *formed* a property settlement agreement.

Apart from that, the circuit court properly assessed the conscionability of the parties' agreement based upon the evidence the parties adduced at the April 29, 2021 final hearing. The applicable statute, KRS 403.180(2), required the circuit court to consider the conscionability of the parties' agreement prior to incorporating it into its decree. This inquiry necessarily encompassed an assessment – viewed at the time of dissolution – of whether the agreement was oppressive or manifestly unfair, or of whether either party's position had suffered in a manner which was beyond the contemplation of the parties when they entered the agreement. *See Blue v. Blue*, 60 S.W.3d 585, 591 (Ky. App. 2001); *Gentry v. Gentry*, 798 S.W.2d 928, 936 (Ky. 1990); *Peterson v. Peterson*, 583 S.W.2d 707, 711 (Ky. App. 1979). The evidence adduced at the April 29, 2021 final hearing related to the parties' respective economic circumstances and thus the

conscionability of the parties' agreement as of that date, which was shortly before the circuit court dissolved their marriage on May 4, 2021.[2]

### 2. Whether the circuit court erred in determining the parties' agreement was not unconscionable

As Delene somewhat indicated in her argument set forth above, on December 10, 2020, the circuit court initially heard Delene's motion to set aside her agreement with Randy based on unconscionability, but concluded on that date that there had been insufficient evidence presented regarding the actual values of the parties' real estate and financial accounts described in their agreement to enable it to properly consider "the economic circumstances of the parties" per KRS 403.180(2), and thus properly adjudicate her motion. The circuit court accordingly directed the parties to take additional discovery in that regard, and later resolved the conscionability issue by comparing what the parties had agreed to on September 11, 2019, with the value of their assets and respective contributions as proven at the April 29, 2021 hearing.

Essentially, the circuit court assessed the fairness of the parties' agreement by contrasting it with what the parties *hypothetically* would have received had there been no agreement; and it determined that the agreement gave Delene a *better* bargain than what she otherwise would have received under a "just

---

[2] The circuit court's May 4, 2021 order dissolved the parties' marriage, but reserved all other issues, including division of property. *See Putnam v. Fanning*, 495 S.W.2d 175 (Ky. 1973); *accord Goldman v. Eichenholz*, 851 S.W.2d 463, 465 (Ky. 1993).

-16-

distribution" of property pursuant to KRS 403.190 – specifically, about 40% of the marital assets, as opposed to 25% to 33%.[3]  In its exhaustive order to that effect, entered August 30, 2021, the circuit court reviewed the parties' evidence and made the following relevant findings of fact and conclusions of law:

FINDINGS OF FACT

. . .

11. The parties stipulated to all real estate values other than the Whitaker Street house.  The value of 375 Country Club Drive is $435,000.00, Eastwood Heights property is $120,000.00; McBrayer property is $218,000.00, St. James Court condo is $150,000.00, 2124 Kings Cross, Titusville condo is $175,000.00. Petitioner stipulated that Joe Curd is an expert real estate appraiser, whose testimony of $135,000.00 value for the Whitaker Street house was not rebutted.  The parties stipulated that $90,013.96 of the net proceeds from the sale of 1184 McBrayer Road is in Richardson Barber & Williamson's escrow account.  The parties further testified that on September 11, 2019, the Petitioner received the 375 Country Club Drive property, the Eastwood Heights property, the St. James Court condo property, and the Whitaker Street property.  The parties testified that on September 11, 2019, the Respondent received the $90,013.96 of net proceeds from the sale of 1184 McBrayer Road, the remaining McBrayer Road property, and the 2124 Kings Cross, Titusville condo.

12. The parties relied upon the record herein, the pleadings, the prior hearings, the depositions of the parties, the testimony of Ira Kilburn, and submitted exhibits to support their contentions.

---

[3]  The circuit court made this specific "percentages" statement in a February 10, 2022 order overruling Delene's post-judgment motion to alter, amend, or vacate.

13. The Court heard the live testimony of numerous witnesses, financial expert Joel Lane, CPA, real estate expert Joe Curd, and the parties, and has again reviewed the written agreement of the parties contained in the hearing transcript.

14. The Petitioner had a Pentegra retirement account through her employer Whitaker Bank on the date of the marriage, with a value of $20,544.46. The Petitioner and her employer made contributions of $4,136.22 during the period of the marriage. The total contributions were $24,680.68. The value of the Pentegra account on April 22, 2021 was $59,605.39. The increase in value during the period of the marriage was $39,060.73. Based upon the tax information and the documents provided by the Petitioner, 17% of the gain, $5,937.20, is marital. The total marital portion of the Petitioner's retirement with contributions during the period of the marriage and the growth of same is $10,073.42. The parties agreed that the Petitioner's retirement account was assigned to her, and the Court finds $49,531.97 as her separate nonmarital property and $10,073.42 as marital property.

15. The Respondent had an IRA with Morgan Stanley at the time of the marriage. The Petitioner has now stipulated that the amount of $216,392.00 is Respondent's separate nonmarital property. The Respondent and financial expert Joel Lane testified that Respondent had an IRA with Morgan Stanley with said amount at the time of the marriage, that was transferred to Merrill Lynch when the Respondent's broker moved to Merrill Lynch. CPA Lane testified that the retirement account was not closed but was transferred as there was no tax evidence of a closure of the account in the year of transfer. The records and CPA Lane documented that at the time of the first marital contribution in September 2005 the value of the account was $224,443.97, that the contributions made during the period of the marriage were $323,200.00, that 41% of the retirement account was Respondent's separate property and 59% of the

retirement account was marital property with contributions during the period of the marriage and the growth of same. The value of the account on March 31, 2021 was $833,647.17, of which $341,795.34 the Court finds is Respondent's separate property and is assigned to the Respondent, and the Court finds $491,851.83 is marital property and as the parties agreed, it is assigned to the Respondent.

16. The Respondent had a Charles Schwab account ending in #22 that had a value of $41,964.61 on the date the parties married based upon monthly statements. On September 11, 2019, the parties agreed that the Respondent would receive the account. At the April 2021 hearing the Respondent testified that the balance had never been below that amount and claimed same as his separate nonmarital property. He made no claim for the income earned on this amount during the period of the marriage. The Respondent also traced, through documents and the expert testimony of Joel Lane, CPA, his separate nonmarital funds into the Schwab account ending in #22. The Respondent owned a Morgan Stanley investment account ending in #01 with a value of $77,295.60 when the couple married. When Respondent's broker moved from Morgan Stanley to Merrill Lynch the account balance of $100,393.17 was transferred to Merrill Lynch account ending in #88. The Merrill Lynch Account was closed on April 27, 2012, and the balance of $71,038.38 was transferred into the Whitaker Bank Account ending in #32. On May 14, 2012, the balance was sent to the Charles Schwab Account ending in #22, and on May 18, 2012, the AT&T stock was purchased at a price of $33,658.95. The AT&T stock is still owned, and the value of the stock is $52,768.80.

17. The Court finds that the Respondent's initial account values of $41,964.61 plus the current value of the AT&T stock of $52,758.80 is the Respondent's separate nonmarital property. The parties stipulated the Schwab

account value of $515,763.67. The balance of $421,040.26 in the Schwab account after assignment of the Respondent's separate property is marital, and the parties assigned to the Respondent.

18. Petitioner's September 11, 2019, agreement included the Whitaker Street house as marital property and was assigned to her. She now claims the house on Whitaker Street, Morehead, KY, as her nonmarital property. She owned same prior to the marriage. The Respondent provided documents that established he paid off the mortgage in the amount of $79,397.45 on the home prior to the parties' marriage. The Petitioner claimed that the Respondent made a gift of same. The Respondent denied that he intended to make a gift of the property. He claimed this asset as his separate nonmarital property. The parties both testified that the house was used as rental property during the period of the marriage, that improvements were made on same during the marriage, and the tax returns supported this. During the pendency of the action the parties agreed to list this property and sell same per an agreed order. The Respondent claimed that it was a joint venture to acquire real estate and the Court so finds that it was same, and the Court finds that it is marital property with a value of $135,000.00 based upon the unrebutted testimony of Real Estate Appraiser Joe Curd.

19. The parties agreed they had a joint checking account at Whitaker Bank Acct. ending in #32, in the amount of $305,000.00. On September 11, 2019, it was agreed that the Petitioner received $200,000.00 and that the Respondent received $80,000.00 and the balance was used for marital bills. The records showed the Petitioner withdrew $150,000.00 in June 2018 and continued to spend the remaining balance for her benefit, including the payment of her credit card bills. The Respondent by Court order received $80,000.00 of this account during the pendency of the action. The Petitioner did not rebut the Respondent's documents, the Petitioner's credit card

records or the joint bank account records, which established that she had received the benefit of $210,808.17 of the $305,000.00. The Respondent established that he received the $80,000.00 and the benefit of $14,191.83 from the joint account by either checks paid or charges for his benefit made by the Petitioner on her credit card. The court finds that the Petitioner received $210,808.17 from the joint account and the Respondent received $94,191.83 from the joint account.

20. The parties had a rental account at Whitaker Bank ending in #25, and even though it was assigned to the Respondent per the September 2019 agreement, the Petitioner testified she closed that account upon the advice of her counsel on the day of the hearing. Her Counsel Ira Kilburn testified that he did not advise her to do so. She received $3,844.18 from that account. This is assigned to the Petitioner as a marital asset.

21. The parties agreed that the Respondent was assigned the TD Bank account he closed in the amount of $1,627.00.

22. In the September 11, 2019, agreement the parties informed the Court that they had agreed that the bank accounts had been received as an equal exchange. The Court finds based upon the records that the parties produced they received same as follows: Petitioner received Whitaker Account ending in #41 of $33,929.00, Whitaker Account ending in #47 of $38,392, Whitaker Bank CD of $8,875.00; and the Respondent received US Bank account ending in #53 of $65,947.27, and US Bank account ending in #13 of $2,124.32. The Court finds that agreement was in just proportions and was fair. The Respondent provided records and testimony that any remaining balance in the account ending in #13 were his Social Security benefits and the $80,000.00 marital funds he received from the Whitaker Bank joint account ending in #32 per this Court's prior order.

23.  In the September 11, 2019, agreement the parties informed the Court that they had agreed that the vehicles were traded out to be an even exchange of marital property.  At the April 20, 2021, hearing, the Petitioner did not present any evidence regarding same, and has requested that they be sold.  The Respondent testified he valued same, based upon the Petitioner's discovery responses and requested the exchange and values as follows:  2012 Cadillac SRX-$17,000.00; 2010 Cadillac SRX $6,500.00; 2005 Mercedes CLK 320 $7,000.00, all to the Petitioner.  Based upon the Petitioner's interrogatory responses the Respondent would receive a 2005 Toyota Highlander-$7,500.00; a 2012 Lincoln MKZ Sedan-$13,000.00, a 2005 Ford van-$2,400.00 assigned to the Respondent.  Any remaining equipment or vehicles were owned by corporations, not the parties.  The parties agreed that the Petitioner's daughter would receive the 2010 Cadillac SRX.  The Court finds this to be reasonable and assigns same at the stated values.

24. In the September 11, 2019, agreement the Petitioner received the 375 Country Club Drive house at a value of $329,000.00 and the parties agreed that they valued the Respondent's nonmarital interest in same at $126,000.00.  The Petitioner was to pay the Respondent this amount when the property was sold or within one year from September 11, 2019, whichever occurred first.  The parties agreed that the Respondent would have a first lien on 375 Country Club Drive to secure the payment of the amount.  On April 20, 2021, the parties stipulated that the property at 375 Country Club Drive was valued at $435,000.00.  The Petitioner provided no evidence to rebut that the Respondent's corporation owned the real estate upon which the house was constructed prior to the marriage.  There was no mortgage.  The Petitioner's appraiser, Norma Mullins, valued the real estate at $69,200.00.  The Respondent established through bank records that he had partially constructed the home prior to the couple's marriage, and thereafter contributed his separate funds into a construction account and he

produced documents to support this in the amount of $121,154.83. The Respondent was able to trace the amount from his separate funds. The Respondent actually has a separate interest in same in the amount of $190,354.83, not the $126,000.00 that the parties agreed upon on September 11, 2019. The Petitioner received a windfall of $64,354.83, and the Respondent lost the benefit of same. The actual remainder of the $435,000.00 value is marital in the amount of $244,645.17. The Petitioner received the property at $203,000.00. However, the Respondent agreed to same. The Petitioner shall pay the Respondent the sum of $126,000.00 within one year from September 11, 2019, or when it is sold whichever occurs first. The Respondent has a first lien on the 375 Country Club house and lot, Morehead, Kentucky to secure payment of the amount of Respondent's separate property.

25. The parties agreed on September 11, 2019, they had household goods and furnishings in Country Club Drive, Morehead, KY and Kings Cross in Titusville, FL. Per their agreement, the Petitioner received the furnishings at 375 Country Club at a value of $25,000.00, and the Respondent received the furnishings at Titusville at a value of $5,000,00. At the April 29, 2021, hearing the Respondent testified unrebutted that the furniture at Country Club Drive was purchased new, and the furniture at Titusville was purchased used at consignment stores. He valued the Country Club Drive furniture at $25,000.00 after restoration of the items the Petitioner claimed as separate property. He testified that he would sell the household goods and furnishings at Titusville for $5,000. The Court finds the marital household goods and furnishings at Country Club Drive assigned to the Petitioner were correctly valued at $25,000. The household goods and furnishings assigned to the Respondent were correctly valued at $5,000. In addition, the parties purchased a grand piano with marital funds. The parties agreed that the piano is the property of Elisabeth Riddle. At the April 29, 2021, hearing the

-23-

Petitioner submitted a list of some household goods and the Respondent stipulated to those few items as being the Petitioner's nonmarital household goods and furnishings. The Court so finds those few items to be the Petitioner's nonmarital household goods as stipulated.

26. On September 11, 2019, the parties agreed that the Respondent would receive the 2.5% ownership in Cherry Blossom Golf Club, LLC whatever the value was. In the April 2021 hearing the Respondent presented corporate records of a purchase price of $30,000.00 in 2008, with steady decline in value to tax records reflecting 0 value in 2016. The Court finds that it was reasonable that the parties assigned no value to same, and it is again assigned to the Respondent.

27. On September 11, 2019, the parties agreed that the Respondent owned businesses prior to the marriage and assigned no value to any of them as marital property. The Petitioner now alleges that there is a marital component of those assets. The Respondent provided records which established the Respondent owned 50% of the stock in Sheltowee Trail Country Club, Inc., when he married the Petitioner. At the time of the marriage, it was an active golf course which closed during the marriage. The Petitioner alleged that she had contributed to the running of the property, but the Respondent testified that at the time of the marriage it was an active golf course; that it had to close due to losses; then it was an event venue which the owners could not make successful; and subsequently rented same to Terry Fitzer, the owner of Reno's Restaurant, who was not able to make it profitable. Thus, its assets continue to be a bank account and the same real estate which was owned by the corporation prior to marriage with no mortgage indebtedness. The total corporate assets on January 31, 2005, were $396,891.27 and in 2019 the total assets were $166,721.00. The corporate tax returns documented the values. The Petitioner introduced bank records for a corporate bank account and the court finds that the

account is an asset of the corporation, not a marital asset. The Petitioner offered no documentary evidence to substantiate her claim that the value of the corporation was increased due to her efforts during the marriage. The Court finds no marital asset in the corporation. The 50% stock ownership is assigned to the Respondent as his separate nonmarital property.

28. The Respondent also presented records which prove he owned 50% of the stock in Producer Services Corporation when he married the Petitioner. The corporate records show total assets of $897,792.85 on January 31, 2005, and $407,684.00 on December 31, 2019. The Court finds no increase in the value of the corporation during the period of the marriage. The Petitioner introduced bank records for a corporate bank account and the court finds that the account is an asset of the corporation. The Court finds that the 50% stock ownership is the Respondent's separate nonmarital asset and assigns it to him.

29. The Respondent also presented bank records and public records which show he had a failed business DBA Chamber Distributing; that the bank account remains, and was used to pay bills, and distribute funds to and for the benefit of the Petitioner's daughter. The Respondent provided bank records and Schwab statements that showed the Petitioner continued to transfer funds from the Schwab account to this bank account for the benefit of her daughter after the parties separated, and after the Court entered a Status Quo order in June 2018. The value of same is $200.00. This is a marital asset that was received by the Respondent.

30. The Petitioner now alleges that there were other businesses owned by the Respondent but offered no documentation of same or values of same. The [Respondent] provided public records from the Kentucky Secretary of State which showed he had owned an interest in various businesses during the period of the

marriage which had all been dissolved. The Court assigns no value to any other businesses.

31. The Petitioner now alleges that there was a Raymond James account, but offered no documents to support this allegation. The Court finds that there is no Raymond James account.

32. The Court finds that the Kentucky Farm Bureau check in the amount of $15,025.15 for a water damage claim to the Country Club residence disclosed by the Petitioner after the September 11, 2019 hearing, is a marital asset and shall be assigned 40% to the Petitioner and 60% to the Respondent.

33. The Respondent testified that the Petitioner's daughter took a trip to Europe at a cost of $6,316.65 after the parties separated which was charged on the Respondent's credit card. The September 11, 2019, agreement did not require the Petitioner to repay same. The Court finds that this is the Petitioner's sole debt, and Respondent did not assert a request for payment of same by the September 11, 2019, agreement.

34. The Court has held the Respondent's motions to hold the Petitioner in contempt until the final hearing. The Court finds that the Petitioner's taking of joint bank accounts after the September 11, 2019, hearing was contemptuous as they were not assigned to her, and her attorney at the time, Ira Kilburn, testified that he did not advise her to do so. The Court finds that an award of an attorney's fee to the Respondent in the amount of $2,500.00 for the Petitioner's contemptuous actions of closing two Whitaker Bank accounts she agreed were to be assigned to the Respondent on September 11, 2019, is reasonable, and payment shall be made within thirty (30) days of this decree.

35. The Petitioner requested payment of any attorney's fee of $20,000.00. The court finds she has more than

sufficient financial resources to pay her own attorney's fees.

36. The Court finds that based upon the parties' testimony, both live and by deposition, the exhibits introduced at the April 29, 2021 hearing and the record herein, the Petitioner was assigned substantial assets in the parties' September 11, 2019, agreement, that the parties were married for a period of thirteen years prior to separation, and that there were no children born of the marriage. The court further finds that the parties had a housekeeper during the marriage, that the parties spent marital funds to make the basement of the Country Club Drive house habitable for the Petitioner's ailing parents, and that the parties spent considerable marital funds for the benefit of the education, care, living expenses, and vehicle for the Petitioner's daughter. Even though the Petitioner was receiving child support to support her minor daughter the Respondent supported the daughter during the period of the marriage. The Petitioner's daughter took a trip to Europe and charged same on the Respondent's separate credit card in the amount of $6,316.65 after the parties were separated. The parties allowed the Petitioner's son to live in one of the rental properties rent-free for a period of time and the parties purchased a house for the Petitioner's brother to live in. The Respondent was the person responsible for dealing with the brother who suffered with psychological problems.

37. The Petitioner will qualify for social security benefits from the Respondent's account based upon duration of the marriage. The Respondent worked the entire marriage prior to his retirement in 2017, earning in excess of 95.5676% of the income (based upon Joel Lane, CPA's testimony unrebutted). The Respondent came into the marriage with substantial assets, while the Petitioner had few assets at the time of the marriage. Some of the assets have increased since the parties' agreement. Based upon the assigned assets that the

parties agreed were separate nonmarital property, the actual values of the assets included in the marital estate which the parties agreed were the marital assets, the values as stipulated to by the parties, the assignment of marital assets to the Petitioner totals 40% and the assignment of marital assets to the Respondent totals 60%.

38. The Court finds that all assets assigned to the parties per their September 11, 2019 agreement and any appreciation thereon should be that party's asset.

After considering the foregoing, the circuit court incorporated the parties' September 11, 2019 agreement into its final decree. Notably, in its conclusions of law, it held:

At the time of the final hearing, the value of the marital estate was $2,676,393.12. The parties' agreement provides that the Petitioner is entitled to 40% of the marital estate ($1,074,931.83) and the Respondent is entitled to 60% of the marital estate ($1,601,461.29). The court concludes such division is a just proportional division of the marital estate per KRS 403.190, and finds that the parties' agreement is not unconscionable.

We now proceed to the several "unconscionability" arguments Delene advances on appeal. First, Delene argues her division of property with Randy did not appropriately conform to KRS 403.190. She emphasizes that she "asked for an equal distribution of the marital estate," and that her agreement with Randy should be set aside on unconscionability grounds because, in her view, she "received far less than the equitable share entitled to her under KRS § 403.190." She also disagrees with how, or the extent to which, the circuit court "divided" some of the

-28-

assets discussed in its order as "marital" or "separate" property – particularly the Whitaker Street property, the Country Club property, the AT&T stock, the Pentegra account, the two Whitaker bank accounts, and CD that originated with her parents.[4]

In making these arguments, Delene misunderstands the purpose and function of a property settlement agreement in this context. If the parties did *not* have such an agreement, KRS 403.190 would have applied, requiring the circuit court to determine the just division of their marital estate. But the parties *did* have such an agreement. And where there *is* such an agreement, and it is valid, the parties define for *themselves* their marital and non-marital property and debts; they may bargain away their respective marital and nonmarital property rights; and their agreement is binding upon the court:

> [A] husband and wife in Kentucky may define by agreement their rights in each other's property, regardless of any rights which would otherwise have been excluded or conferred by KRS 403.190. Such agreements, provided they are otherwise valid contracts, are entitled to enforcement upon dissolution of the marriage.

*Gentry*, 798 S.W.2d at 934.

---

[4] To be sure, Delene initially offered these arguments in the section of her brief entitled, "as there was no agreement, the trial court's classification, valuation and division of the assets was in error." However, she subsequently reincorporated them in the section of her brief entitled, "assuming, *arguendo*, there was an agreement it was unconscionable."

Here, the circuit court did not divide the parties' marital assets; it assigned those assets – or assets traceable to them – consistently with the parties' bargain. Furthermore, "[a] mere discrepancy in the amounts received by each party under a settlement agreement is not enough to render the agreement unconscionable." *Money v. Money*, 297 S.W.3d 69, 73 (Ky. App. 2009) (citation omitted).

Second, Delene argues the agreement is "unconscionable" because "[u]pon leaving the courtroom [on September 11, 2019] Delene realized mistakes had been made." Elaborating upon these "mistakes" in her brief, she asserts that during the September 11, 2019 hearing, "she did not know the actual values as to any of the properties"; she "did not remember any discovery related to the amounts of the Charles Schwab account or the Merrill Lynch account"; and:

> [S]he very clearly stated [at the April 29, 2022 hearing] that she did not understand the economic ramifications of the agreement as she did not believe the Whitaker Street property had any reason to be included in the marital side of the ledger. She also agreed to take all properties with no income to support them, despite her and Randy having to use thousands of dollars per month to do so, according to her testimony.
>
> Randy was able to keep the entirety of the significant cash-related assets. Delene would deplete whatever cash she had just maintaining the properties, even if used as rentals, making what she received of substantially less value. If she were to sell the properties, she would obviously receive substantially less of the value attributed them after real estate commissions and taxes

were paid. Given the improper inclusion of non-marital property, the lack of information she had at the time and the greatly reduced true value of what she received, the agreement was certainly unconscionable, making the trial court's determination that it was not, clearly erroneous as she agreed to something that was several hundreds of thousands of dollars detrimental to her.

Taking these "mistakes" in turn, we begin with Delene's related assertions that the agreement was unconscionable because, prior to assenting to it, she did not know or remember the values of the assets it contemplated or appreciate its economic ramifications.

Conspicuously missing from these assertions is any indication that Delene's ignorance was attributable to anyone other than herself or her counsel; or that she was otherwise deprived of a full and fair opportunity to review the specifics of what effectively became her written agreement with Randy before she chose to accept it in open court. Accordingly, these assertions are not indicative of reversible error. Under Kentucky law, the general rule regarding contractual enforceability is, "absent fraud in the inducement, a written agreement duly executed by the party to be held, who had an opportunity to read it, will be enforced according to its terms." *Schnuerle v. Insight Comm. Co., L.P.*, 376 S.W.3d 561, 575 (Ky. 2012) (citation omitted). Likewise, "Neglect, mistake or bad advice of counsel is not an unavoidable casualty warranting the granting of a

new trial." *Saint Paul-Mercury Indemnity Co. v. Robertson*, 313 Ky. 239, 230 S.W.2d 436, 439 (1950) (citations omitted).

Next is Delene's assertion that "she did not believe the Whitaker Street property had any reason to be included in the marital side of the ledger." If Delene entertained this belief *prior* to September 11, 2019, then the agreement she made with Randy on September 11, 2019, effectively waived any argument consistent with that belief. *Gentry*, 798 S.W.2d at 934. On the other hand, if Delene is asserting she entered the agreement due a "mistake" in believing the Whitaker Street Property was properly classified as a marital asset rather than her separate property, the "mistake" can only be considered her own unilateral mistake of law. One party's mistake of law – defined as an "erroneous conclusion respecting the legal effect of known facts" – "will not affect the enforceability of an agreement[,]" unless "induced by fraud, undue influence or abuse of confidence[,]" none of which is alleged here. *Sadler v. Carpenter*, 251 S.W.2d 840, 842 (Ky. 1952) (citation omitted).

Lastly, Delene asserts the agreement was unconscionable because it mostly assigned real property to her, whereas Randy received more of the liquid assets. This appears to be a complaint that she is dissatisfied with her bargain. We add, however, that her dissatisfaction may have been lessened if she had rented out the properties assigned to her. Nothing prevented Delene from doing so; and

-32-

according to Delene's expert appraiser, Alma Mullins, each of the three rental properties Delene was assigned had a fair rental value between $1,000 and $1,200 per month. Nevertheless, according to Delene's testimony, she took no action in that regard between September 11, 2019 and the April 29, 2021 hearing.

In any event, the doctrine of unconscionability "is directed against one-sided, oppressive and unfairly surprising contracts" rather than "against the consequences *per se* of uneven bargaining power or even a simple old-fashioned bad bargain." *Schnuerle*, 376 S.W.3d at 575 (citation omitted). Accordingly, the operative inquiry when evaluating whether a contractual agreement is unconscionable involves a consideration of factors such as each party's bargaining power, conspicuousness and comprehensibility of contractual terms and language, oppressiveness of the terms, and the presence or absence of a meaningful choice. *See Peay*, 406 S.W.3d at 835. Here, Delene fails to address most of those factors. Specifically, she does not argue that she and Randy had less-than-equal bargaining power. She does not argue the terms and language of their agreement were difficult to understand, or not comprehensive. Nor does she argue the agreement was *unfairly* surprising, or that she lacked a meaningful choice in the matter. Furthermore, she was aptly represented by the counsel of her choice at all relevant times.

We review the circuit court's unconscionability determination under the abuse of discretion standard. "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Goodyear Tire and Rubber Co. v. Thompson*, 11 S.W.3d 575, 581 (Ky. 2000) (citing *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999)). Here, we have noted that the circuit court resolved the conscionability issue by comparing what the parties had agreed to on September 11, 2019, with the value of their assets and respective contributions as proven on April 29, 2021; and in doing so, it considered "the economic circumstances of the parties and any other relevant evidence produced by the parties" consistently with KRS 403.180(2), and effectively determined the agreement was not oppressive or otherwise unconscionable.

In sum, the circuit court observed that the parties' agreed-upon marital estate had a value of roughly $2.7 million. Delene brought few assets to the marital estate; generated little to no marital income during the approximate thirteen years of the parties' marriage, despite apparently having the ability to work; and had no children with Randy to care for. On the other hand, Randy provided the vast majority of the parties' assets and income; and he substantially provided for not only Delene, but also several members of Delene's family. Taken objectively, we cannot say that the parties' agreement, which entitled Delene to over $1 million

-34-

of the agreed-upon marital assets, was "one which no man in his senses, not under delusion, would make, on the one hand, and which no fair and honest man would accept, on the other," and thus "unconscionable." *Schnuerle*, 376 S.W.3d at 575 (citation omitted). Having reviewed the record, the circuit court's findings and assessments of the evidence are not clearly erroneous, nor did the circuit court otherwise abuse its discretion in finding the parties' agreement conscionable. CR 52.01.

## II. DELENE'S ATTORNEY'S FEES

Delene asserts the circuit court erred in denying her motion to have Randy pay her attorney's fees. Her argument, in relevant part, is as follows:

> In the present matter, Randy's expert testified that their respective income disparity during marriage was approximately 96% to 4% in Randy's favor. Almost the entirety of the value of what Delene was awarded was real property, leaving her some cash but limited continuing liquidity. She has not worked since 2006. Randy received all of the accounts from which the parties had been living for years.

We disagree. Pursuant to KRS 403.220, an award of attorney's fees in this context is not mandatory. "Generally, the only factor that a court is required to consider when awarding attorney's fees is the financial resources of the parties." *Bailey v. Bailey*, 399 S.W.3d 797, 803 (Ky. App. 2013) (citation omitted). However, even when a disparity in financial resources exists, an award or denial of the payment of fees "is within the discretion of the court depending on the

-35-

circumstances of each particular case." *Batson v. Clark*, 980 S.W.2d 566, 577 (Ky. App. 1998) (quoting *Kentucky State Bank v. AG Services, Inc.*, 663 S.W.2d 754, 755 (Ky. App. 1984)).

In its dispositive order, the circuit court considered the financial resources of the parties and explained that it denied Delene's motion "based upon her receipt of substantial financial resources." And, while Delene takes issue with the *liquidity* of what she received, she does not contest that $1,074,931.83 – her share of the marital estate – qualified as substantial financial resources. Additionally, while Delene may not have worked "since 2006," she does not explain what prevented her, or continues to prevent her, from doing so. We perceive no abuse of the circuit court's broad discretion in this respect.

### III. CONTEMPT

The final subject of Delene's appeal was touched upon in paragraphs 20 and 34 of the findings of fact in the circuit court's order, set forth above. On June 13, 2018, shortly after the parties initiated the underlying proceedings, the circuit court entered a "status quo" order that provided in relevant part:

> Except as shall be necessary to pay reasonable living expenses, neither party shall sell, encumber, gift, bequeath or in any manner transfer, convey or dissipate any property, cash, stocks or other assets currently in their possession or control of another person, company, legal entity or family member without an order of the Court or an agreed order signed by both parties or their attorneys.

-36-

Following the September 11, 2019 hearing, Randy moved the circuit court to hold Delene in contempt of the status quo order. In sum, he noted Delene had agreed during the hearing that he was to receive their two joint accounts at Whitaker Bank ending in #32[5] and #25; and he alleged that immediately after the hearing, and despite her agreement, Delene had closed the accounts and pocketed the remaining proceeds. When deposed about this matter on October 6, 2020, Delene admitted doing so, but added she had done so upon the advice of her then-counsel, Hon. Ira Kilburn.

The circuit court held a hearing about this issue on December 10, 2020. There, as indicated in the circuit court's order, and subject to Delene's cross-examination, Kilburn testified he had given Delene no such advice, and that he would never have directed any client to defy a court order. Afterward, the circuit court informed the parties that it would rule on Randy's contempt motion as part of its final disposition of their dissolution. And, as stated, it did so. After considering the evidence presented, it held Delene in contempt and ordered her to pay $2,500 of Randy's attorney's fees as a sanction.

Now on appeal, Delene's sole argument is that the circuit court violated her due process rights by depriving her of a jury trial regarding her

---

[5] While not relevant to our analysis, we note that between Paragraphs 20 and 34 of the circuit court's final decree, the circuit court indicated Delene closed Whitaker Bank *accounts*, but specifically references only the account that ended in #25.

contempt.[6] As to how she preserved this issue for appeal, she states: "*See* Motion to Vacate, ROA at 1786-1796."

With that said, there are two problems. First, what she filed – *i.e.*, a post-judgment motion to vacate pursuant to CR 59.05 – is not a device for raising or preserving issues that could and should have been raised prior to a final judgment. *Hopkins v. Ratliff*, 957 S.W.2d 300, 301 (Ky. App. 1997) (citation and footnote omitted). Clearly, Delene understood well in advance of the circuit court's final judgment that the circuit court, rather than a jury, was going to decide Randy's contempt motion.

Second, and contrary to what Delene has represented to this Court, her CR 59.05 motion did *not* take issue with her lack of a jury trial for contempt. To the extent it broached the subject of contempt at all, her motion instead set forth the following two unrelated issues, which she has never pressed in this appeal:

> 1. This Court decided to hold Petitioner in contempt. The Court found in its Conclusions of Law "the Petitioner is in contempt by violating the parties' written agreement by closing two bank accounts assigned to the Respondent". See paragraph 10 on page 16 of the August 30, 2021, Order. No written agreement exists in the within action.

---

[6] The award of attorney's fees to Randy was authorized by KRS 403.220 regardless of any contempt finding. A contempt sanction of attorney's fees does not equate with a fine of more than $500 for which a right to jury trial exists under *Miller v. Vettiner*, 481 S.W.2d 32 (Ky. App. 1972). *See Kentucky Retirement Systems v. Foster*, 338 S.W.3d 788 (Ky. App. 2010).

2. A party cannot be held in contempt of a written agreement but only in contempt for violation of a written order of the Court and the Court has failed to state what order Petitioner allegedly violated.  The Petitioner was ordered to pay [a] $2,500 attorney fee to Respondent because of the supposed contempt but without there having been an order violated the Court is without jurisdiction to issue an attorney fee award under a contempt citation.  The Court should amend its Order to state with specificity what order was violated and whether same was done knowingly, intentionally, voluntarily, or it should vacate that portion of the Order finding her in contempt and awarding an attorney fee based on same.

In short, Delene's argument that she was entitled to a jury trial for contempt is an argument she has posed, for the first time, to this Court.  We will not address it because Delene has not requested palpable error review of this argument;[7] and in any event, "[o]ur jurisprudence will not permit an appellant to feed one kettle of fish to the trial judge and another to the appellate court."  *Owens v. Commonwealth*, 512 S.W.3d 1, 15 (Ky. App. 2017) (citations omitted).  Assuming Delene had any right to a jury trial below, her failure to properly assert it was an effective waiver.

---

[7] Absent extreme circumstances amounting to a substantial miscarriage of justice, an appellate court will not engage in palpable error review "unless such a request is made and briefed by the appellant." *Jenkins v. Commonwealth*, 607 S.W.3d 601, 613 (Ky. 2020) (quoting *Shepherd v. Commonwealth*, 251 S.W.3d 309, 316 (Ky. 2008)).

## IV. Conclusion

We have reviewed each of Delene's appellate arguments. Having deemed them lacking in merit, we therefore affirm.

ALL CONCUR.

BRIEF FOR APPELLANT:

Jason Rapp
Lexington, Kentucky

BRIEF FOR APPELLEE CHARLES RANDALL GILKERSON:

Paula Richardson Barber
Morehead, Kentucky